UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| KASTURI HALDAR, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.:  3:24-cv-836 |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF NOTRE DAME | ) | |
| DU LAC, SANTIAGO SCHNELL,   and | ) | |
| CINDY PARSEGHIAN | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**I.    INTRODUCTION**

Plaintiff, Kasturi Haldar, has a long history of abusing her position as a research scientist at the University of Notre Dame by mistreating her laboratory personnel in violation of her faculty contract and the University's Respectful Environment Policy. The University tried to stop Plaintiff's misconduct with informal coaching in November 2021 and, when that failed, with temporary restrictions on her laboratory in May 2022. Still, Plaintiff refused to correct her bad behavior – even after a faculty grievance committee affirmed the May 2022 restrictions as necessary to stop her demeaning, intimidating and retaliatory behaviors. In fact, Plaintiff's pattern of misconduct recently expanded from lab colleagues to donors who fund University research.

While Plaintiff's work as a research scientist produced plenty of complaints about her abusive behavior, it increasingly has generated fewer and fewer academic results. For example, the National Institutes of Health ("NIH"), the federal agency with the resources and expertise to support faculty members conducting research in Plaintiff's field of study, has not funded Plaintiff's

research since 2016. As a result, Plaintiff has relied solely on University donor funding to the Boler-Parseghian Center for Rare and Neglected Diseases ("CRND")[1] to support her research.

Because Plaintiff refused to correct her abusive behaviors despite multiple opportunities over several years to do so and because of the apparent lack of viability and quality of her research, the University decided to close her lab effective this December. Importantly, Plaintiff's employment is not being terminated, and she retains her salary and rank as a full tenured professor.

Plaintiff seeks a temporary restraining order ("TRO") requiring the University to keep her lab open, fund her research, and lift restrictions on her lab, including restrictions in place for over two years. (DE 5 at 2). There is no emergency here that requires an "extraordinary and drastic remedy." The fact that Plaintiff waited two-and-a-half years (in the case of the 2022 discipline) and nearly six weeks (in the case of the notice of the closing of her lab) to seek such extraordinary relief underscores that point. Even so, the current state of affairs *is* the status quo for the next two months: Plaintiff's lab will not close until December 12, 2024 (DE 1 at 18, ¶115(d)); her mice research subjects were not scheduled to be euthanized until November 29, 2024 and the University has since instructed the breeding team not to do so without further authorization (DE 1 at 19, ¶121; DE 4-12 at 2; DE 18-1 at 5, ¶14); the breeding mice have already been segregated (DE 4-12 at 5); Plaintiff has access to the Haldar Capitalization Fund until December 12, 2024 (DE 4-7 at 9); her biological materials for her malaria research are being cryopreserved (DE 18-2 at 2, ¶3); and the University has also offered to cryopreserve the specially bred mice embryos and semen, which would allow Plaintiff to restart her research within six to eight months. (*Id*. at ¶4). No irreparable harm will occur in the next fourteen days or while Plaintiff litigates her claims. FRCP 65(b)(1)(A), (b)(2). Nor is there any likelihood Plaintiff will succeed on her claims.

---

[1] This Center is now known as the Boler-Parseghian Center for Rare Diseases, but for most of Plaintiff's tenure it was known as CRND, so the Response refers to it as such.

What Plaintiff really seeks is to preserve the *status quo ante* – a permanent return to the conditions of her laboratory *prior* to the implementation of the 2022 discipline – relief that neither a temporary restraining order nor a preliminary injunction is designed to address. Her basic premise is that because she is a research scientist, the University must provide lab space and funding for her lackluster research regardless of how abusive she is to her laboratory personnel, her colleagues and the donors who helped fund her research. Under no scenario should the University be compelled to continue sponsoring and funding a research agenda that would enable a principal investigator to bully the University community—a clear and present risk given her past behavior and the ineffectiveness of prior interim disciplinary measures. Accordingly, Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction should be denied.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Conspiracy Theory

Plaintiff weaves a tale of an alleged lengthy conspiracy to close down her research based on her race, age, national origin and gender that began in 2008 and could not be effectuated until now, some 16 years later. Specifically, Plaintiff contends that in 2008, Defendant Cindy Parseghian, a white American woman who was then a member of the University's Board of Trustees, allegedly wanted to hire a white male professor to head the CRND. (DE 1 at 7, ¶¶45-47). However, Plaintiff received the job in 2008, which she held until 2022. (*Id.* at 6, 12, ¶¶34, 79). Plaintiff also alleges that in 2019 Parseghian barred her from attending a conference, falsely accused her of stealing results from another scientist, and told University administrators she did not like Plaintiff, who she supposedly said did not represent "her Notre Dame." (*Id.* at 8, ¶50).

Then, in 2021, Defendant Santiago Schnell, a "white Hispanic" male who had been appointed the Dean of the College of Science ("the College"), allegedly joined the decade-long

conspiracy, and purportedly told Plaintiff (who was 64) that he wanted her to "hire and groom a 'mid-career' (i.e. younger) professor to serve as CRND Director." (*Id.* at 9, ¶56). That same year, according to Plaintiff, Dean Schnell allegedly instigated an investigation into Plaintiff's lab, used that investigation as a basis to remove her from her role as CRND Director, restricted her from using certain CRND funds and barred her from hiring new lab personnel. (*Id.* at 11-12, ¶¶74-79). Dean Schnell purportedly also took steps against her in November 2023, when he allegedly stopped approving Plaintiff's requests to use other funds and "refused" to take steps to preserve the mice colonies specially bred for her experiments. (*Id.* at 16, ¶104). Most recently, on September 6, 2024, Dean Schnell sent Plaintiff a letter (the "9/6 Letter") indicating that, among other things, "he was closing her lab permanently as of December 12, 2024." (*Id.* at 18, ¶115).

### B.    Plaintiff's Misconduct and Opportunities to Correct

The accurate version of events is much more straightforward and coherent. Within a few months of Dean Schnell arriving at the University, his office began receiving complaints from Plaintiff's lab members, primarily around excessively long working hours and fear about taking time off. (DE 18-3 at 8, ¶¶ 27-28). One reported complaint stood out: Dr. Haldar threatened to terminate a faculty member if she took time off to attend her sister's wake in India. (DE 18-3 at 8, ¶ 29). Dean Schnell and another academic administrator met with Plaintiff to explain  reported concerns and the University's expectations for supervising lab personnel. Dean Schnell reiterated these expectations in his November 29, 2021 letter, which directed Plaintiff to treat her team members "with respect and compassion," cultivate a "healthy training environment," and establish written policies for regular work hours and vacation to address some of the complaints. (DE 4-1). Dean Schnell warned that continued misconduct could impact Plaintiff's privileges to mentor and

hire research staff. (*Id.*). Nevertheless, Plaintiff declined to follow Dean Schnell's recommendations. (DE 4-7; DE 18-3 at 9, ¶ 33.

Around the same time, Lynn Kalamaros of the Office of Institutional Equity commenced an investigation into Plaintiff's lab's work environment at the direction of Maura Ryan, Vice President and Associate Provost for Faculty Affairs. (DE 18-3 at 9, ¶ 34). The investigation uncovered additional concerns and substantiated that Plaintiff had, among other things, "'intimidated and humiliated students and staff' in laboratory meetings," "insult[ed] and target[ed] laboratory members in front of others," threatened employees with consequences for their employment and/or work visas to "impose excessive workloads," and "profound[ly] and negative[ly] impact[ed]" laboratory employees, some of whom concluded they had no choice but to leave her lab. (DE 4-7). This substantiated misconduct violated the University's Respectful Environment Policy, which provides, in part:

> The University will not tolerate demeaning, intimidating, humiliating, or hostile behavior that would negatively impact a reasonable person's ability to learn or work in the University environment and that has such an impact on a Notre Dame community member. Such behaviors have no place in the academic community. Staff and **faculty members** who engage in such unacceptable behavior may be subject to disciplinary action[.]

(DE 4-2, 4-7, DE 18-3 at 5, ¶¶ 15-16 and DE 18-3 at 85 (emphasis added)).

Consequently, as Dean Schnell warned in November 2021, the University had no choice but to take disciplinary action. On May 20, 2022, Dean Schnell removed Plaintiff from her role as the Director of the CRND,[2] restricted her use of certain CRND funds, restricted her from hiring new lab staff and required another faculty member to co-advise the graduate students in her lab ("2022 Restrictions"). (DE 4-2). Dean Schnell also advised Plaintiff she still retained control of

---

[2] Plaintiff's role as CRND Director was set to expire in 2017. (DE 1-4). Though the appointment was not renewed in writing under the prior Dean, Plaintiff continued in her role. (DE 1 at 7, ¶44). According to her appointment letter, she served in the role "at the pleasure of the Dean." (DE 1-4).

the Nieuwland Professor Discretionary funds and she could still have access to the CRND's Nonketotic Hyperglycinemia ("NKH") funds at the CRND Director's discretion. (*Id.*). In other words, Dean Schnell expected Plaintiff, like other CRND members, to submit research proposals for her research funding. (DE 18-3 at 11, ¶40 and DE 18-3 at 106-109). The restrictions were aimed at her supervisory responsibilities and were to remain in place for a three-year period. (DE 18-3 at 11, ¶ 41). These types of corrective measures are consistent with actions taken by federal funding agencies and other universities in reaction to hostile working environments. (*Id.*) Dean Schnell warned Plaintiff that "evidence of continued behavior consistent with the complaints" could result in further action. Defendant Parseghian was not involved in any way in the underlying investigation or in the decision to discipline Plaintiff. (DE 18-3 at 11, ¶ 42 DE 18-4 at 4, ¶19).

Plaintiff grieved this discipline under the standard grievance procedures[3] available to her in the University's Academic Articles (which promulgates the University's principal standards and structures of academic governance). After a thorough inquiry, the faculty grievance committee approved the 2022 Restrictions, writing:

> The Faculty Grievance Subcommittee firstly recommends that the restrictions placed on Professor Haldar's lab by Dean Schnell remain in place, and that she remain stripped of her directorship. The results of the OIE investigation, ***confirmed by discoveries of our own during the course of this grievance investigation***, paint the picture of a lab culture in which power was wielded to demean, intimidate, and threaten retaliation against multiple members of the lab community, such that they are, indeed, in violation of the Respectful Work Environment policy.

(DE 4-5 at 2) (emphasis added).

Despite the two prior warnings in 2021 and 2022,[4] Plaintiff's abusive conduct continued:

---

[3] The Academic Articles provide for notice and an opportunity to be heard when the University seeks to impose discipline involving dismissal of employment, suspension, revocation of tenure, demotion in academic rank, or reduction of individual salary of more than 2%. (DE 1-3 at 30-34). As Plaintiff herself recognized in 2022, none of these actions were taken against her and thus she was not entitled to that notice and hearing process.

[4] The 2022 restrictions did not negatively impact Plaintiff's scientific productivity, which had been on the decline since 2016. (DE 18-3 at 14, ¶ 55).

- In February 2024, several donors to the CRND reached out to Dean Schnell and others in the Dean's Office, reporting that Plaintiff was contacting them at all hours, with alarmist assertions and directly requesting more money from them while instilling fear that their failure to provide additional support would jeopardize important research. Many of these donors have family members impacted by rare diseases and are particularly vulnerable to her appeals;

- In March 2024, the University discovered Plaintiff required a lab staff member to complete and submit a request to the U.S. General Services Administration that Plaintiff be designated as the "Entity Administrator" for all government contracts with the University and that falsely identified the staff member as the University's "Director of Government Contracting." The staff member raised concerns about the legitimacy of the letter. Dean Schnell viewed this incident as another instance of Plaintiff abusing her power with her lab members.

- In June 2024, Plaintiff initiated a dispute with a colleague who had previously worked in Plaintiff's lab but left as a result of Plaintiff's abusive behavior.[5] When this colleague left Plaintiff's lab, Dean Schnell advised Plaintiff and the colleague they had "'equal rights to produce new scholarly work based on [the] previously generated data and materials.'" Nevertheless, when the colleague proposed to add Plaintiff to an abstract given their prior work together, Plaintiff registered "surprise" at her colleague's continued work and demanded to have access to the results so that Plaintiff could determine "where we go from here."

(DE 4-7; DE 18-3 at 12-14, ¶¶ 48, 49, 54).

The University thus determined that Plaintiff's "continued pattern of unacceptable and unprofessional conduct" coupled with her "failure to live up to a variety of University expectations, including expectations regarding [her] insufficient research activity" required the closing of her lab. (DE 4-7 at 2; DE 18-3 at 14, ¶ 56 and DE 18-3 at 111). Dean Schnell did not consult with Parseghian when making this decision. (DE 18-3 at 14, ¶ 59; DE 18-4 at 4, ¶19). Dean Schnell notified Plaintiff of this decision on September 6, 2024, informing her in writing that in approximately three months, her lab would be decommissioned and that the 2022 restrictions would become permanent. (DE 18-3 at 111-118 and DE 18-3 at ¶ 56). Plaintiff was instructed that

---

[5] This colleague's research is focused on the parasite that causes the deadliest form of human malaria. (DE 18-3 at 13, ¶ 54). Like Plaintiff, she is an Asian woman of Indian origin. (*Id.* at 13, ¶ 54).

during the three-month period, she was not to supervise lab personnel or students, and not to serve as a principal investigator or co-principal investigator on *new* grants or contracts. (*Id.*). Plaintiff grieved this decision on October 10, 2024. (DE 1 at 19, ¶120). That grievance remains pending. Plaintiff filed her Complaint and Motion nearly six weeks after receiving the 9/6 Letter.

## III.    <u>The Motion Lacks Merit Because Plaintiff Seeks Relief She Cannot Obtain At Trial</u>

Plaintiff's request for emergency injunctive relief should be denied in the first instance because it is beyond the Court's power to grant her request for funding and to keep her lab open. Plaintiff cannot demonstrate that the University, by contract or otherwise, has assumed an obligation to fund her research beyond the requirements of her appointment letter, or to provide a lab. (DE 1-1 at 2-3). In fact, Plaintiff's appointment letter required Plaintiff to obtain her own funding after the exhaustion of the University funding described in the letter. (*Id.*). Plaintiff has failed to do so. The University therefore made a decision about how to best administer and allocate its resources, which is central to its academic judgment and is routinely given deference. *See, e.g., Univ. of Pa. v. EEOC,* 493 U.S. 182, 198-99 (1990) ("[C]ourts have stressed the importance of avoiding second-guessing of legitimate academic judgments."); *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225 (1985); *Haynes v. Indiana Univ.*, 902 F.3d 724, 734 (7th Cir. 2018) (courts "closely scrutinize discrimination claims" in the tenure context "to be sure the dispute is not simply one of academic disagreement with the underlying decision").

Thus, Plaintiff cannot compel the University to provide her with a lab or fund her research even if she ultimately obtains a judgment against it. While it is appropriate for a court to grant preliminary injunctive relief "of the same character as that which may be granted finally," it is not proper to grant on an interlocutory basis relief that a party could not obtain in a final judgment. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 326-27 (1999) (citing

*De Beers Consol. Mines, Ltd. v. United States,* 325 U.S. 212 (1945)). Thus, the Court should deny her request for a TRO requiring the University to provide her with a lab and funding.

## IV.    Even if the Requested Relief were Viable, Plaintiff is Not Entitled to Such Relief

The purpose of a TRO is to preserve the *status quo* for a brief period until a hearing on a request for a preliminary injunction. *See Smith v. Wilson*, No. 3:07CV338-TS, 2007 WL 4324005, at *1 (N.D. Ind. Dec. 7, 2007) (citing 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2951 (2d ed.1995)); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters,* 415 U.S. 423, 439 (1974) (citations omitted). A TRO is an "extraordinary and drastic remedy" that should not be granted unless the movant carries the burden of persuasion by a clear showing that: (1) she has a reasonable likelihood of success on the merits; (2) she is without an adequate remedy at law; (3) she will suffer irreparable harm absent injunctive relief outweighing irreparable harm if injunctive relief is granted; and (4) the TRO will not harm the public interest. *Dirig v. Wilson*, No. 3:12-CV-549 WL, 2013 WL 2898276, at *1 (N.D. Ind. June 12, 2013) (citing *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005)).

As discussed below, not only does Plaintiff seek relief beyond what she could achieve after a full trial on the merits, she cannot satisfy her burden on even one of these required elements.[6]

### A.    Plaintiff Has Not Demonstrated a Likelihood of Success on the Merits

Plaintiff has not demonstrated and cannot demonstrate that she has a reasonable likelihood of success on the merits of her claims. In fact, some of her claims (such as her claims for breach of the covenant of good faith and fair dealing and tortious interference) are deficient as a matter of law and subject to dismissal. As such, she has no likelihood of success on these claims, much less

---

[6] Plaintiff's record evidence is rife with inadmissible hearsay and lack of foundation. Such evidence should be excluded because "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see, e.g.*, DE 4-9 at p. 33-34 (text messages); DE 4-12 (email string); DE 4-13 at ¶¶7-10, 16, 21, 23 (Plaintiff's affidavit), and DE 4-14 (various articles).

a reasonable one. Moreover, while some of her claims might survive a motion to dismiss, she advances an incorrect legal standard when she argues she has a reasonable likelihood of success. When the correct legal standard is applied, it is clear that she is not entitled to a TRO.

### 1. Plaintiff Advances an Incorrect Legal Standard

In her Motion, Plaintiff claims that she can show a reasonable likelihood of success on the merits of her claims by demonstrating that she has "a greater than negligible chance of winning." (DE 5 at 10 (citing *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 803-04 (7th Cir. 2002)). Plaintiff is wrong. As the Seventh Circuit explained in *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. Sept. 3, 2020), "the 'better than negligible' standard was retired by the Supreme Court" and the proper standard requires the applicant to meet "a significant burden" and make a "strong" showing of how she proposes to prove the elements of her case. *Id.*

### 2. Plaintiff Cannot Prevail on Her Breach of Contract Claim

"In Indiana, it is well settled that '[t]o recover for a breach of contract, a plaintiff must prove that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach.'" *Barney v. Zimmer Biomet Holdings, Inc.*, No. 3:17-CV-616 JD, 2018 U.S. Dist. LEXIS 199906, at *5 (N.D. Ind. Nov. 26, 2018) (citing *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007)). Here, Plaintiff has no likelihood of successfully demonstrating the University breached a contract.

Plaintiff points to her "Faculty Contract" (DE 1-2) and the Academic Articles (DE 1-3) to allege the University "substantially and materially worsened the terms and conditions of [her] employment" that "impinged on her rights as a tenured professor under the Faculty Contract" (DE 1 at 22, ¶¶141-42), and deprived her of process in the Academic Articles when it did so. (*Id.* at ¶143). According to the "Faculty Contract," Plaintiff was appointed to the rank and title of Professor with tenure, and Plaintiff was expected to perform full-time faculty duties, including

research, provided that she "observe the rules and regulations of the University" and "not engage in any … activity which may, in the judgment of the University, interfere with the proper performance of required duties" and "by personal conduct, to promote the principles and ideals for which the University stands." (DE 1-2 at 3, para. (2), (3)). Importantly, Plaintiff retains her rank and title of Professor with tenure, and the "Faculty Contract" does not provide for a right to a research lab space or ongoing University research funding in the face of conduct that violates the University's standards.   Moreover, Plaintiff availed herself of the processes in the Academic Articles incorporated into her "Faculty Contract," unsuccessfully grieving the 2022 Restrictions. Thus Plaintiff cannot identify a breach of the "Faculty Contract."

Next, Plaintiff argues the 2022 and 2024 actions taken against her are "severe sanctions" under the Academic Articles, entitling her to notice and a pre-action opportunity to be heard. But she is wrong. Severe sanctions are limited to the following: dismissal *from employment*; suspension; revocation of tenure; demotion *in academic rank*; and reduction of *individual salary* of more than 2%. (DE 1-3 at 30, Article IV/Section 9/Subsection (b) Definition of Severe Sanction). No such sanctions have been imposed on Plaintiff: she remains employed, has not been suspended, retains tenure, retains her rank and title of Professor, and her individual salary is intact.[7] Because she has not suffered a severe sanction, she is not entitled to the process she seeks. Though she tries to characterize her removal from the CRND Director position in 2022 as both a demotion and a dismissal, the Articles only consider demotion *in rank* and dismissal *from employment* as

---

[7] Plaintiff alleges that she lost her "supplemental summer salary" when she was removed from the Director role in 2022. (DE 1 at 13, ¶87). Plaintiff does not allege this loss equated to more than 2% of her "individual salary," but in any event, it is only the reduction of a faculty member's individual, or base, salary that qualifies as a "severe sanction" and not a reduction or elimination of salary supplements related to administrative roles. (DE 1-3 at 30; DE 18-3 at 59. Plaintiff also ignores that her appointment letter specifically states that she served in the role "at the pleasure of the Dean." (DE 1-4).

severe sanctions, and in any event, her appointment to that role was "at the pleasure of the Dean." There is no breach under this theory either.

### 3. Breach of the Duty of Good Faith and Fair Dealing Is Not a Cause of Action

Because Indiana does not recognize an independent cause of action for breach of the duty of good faith and fair dealing arising out of an employment contract, Plaintiff has no chance, let alone a strong chance, of succeeding on the likelihood of the merits of this claims.[8] *See Bowers v. Anthem Inc.*, No. 1:19-cv-00802-TWP-DLP, 2019 WL 5965235, at *6-7 (S.D. Ind. Nov. 13, 2019) (dismissing claim for breach of the duty of good faith and fair dealing); *see also Posterity Scholar House v. FCCI Ins. Co.*, 205 N.E.3d 1018, 1024 n.1 (Ind. Ct. App. 2023).

### 4. Plaintiff's Tortious Interference Claims Are Not Likely to Succeed

Plaintiff has no timely or meritorious claim of tortious interference against Defendant Parseghian. The statute of limitations for torts in Indiana is two years. IND. CODE § 34-11-2-4; *see also Alexander v. CVS Pharmacy, Inc.*, No. 4:23-cv-00085-SEB-KMB, 2024 U.S. Dist. LEXIS 3421, at *7 (S.D. Ind. Jan. 8, 2024); *Dochee v. The Methodist Hosps., Inc.*, No. 2:21-CV-275-JEM, 2024 U.S. Dist. LEXIS 177077, at *12 (N.D. Ind. Sep. 30, 2024) (dismissing tortious interference claim by employee as time-barred). The specific allegations Plaintiff makes against Parseghian all occurred between 2008 and 2019, between five and sixteen years ago. (DE 1, at 8, ¶¶49-52). Her claim against Parseghian therefore is not timely. Even if it was timely, it lacks merit because the incontrovertible evidence squarely contradicts Plaintiff's speculation "upon information and belief," that Parseghian was involved in the 2022 and 2024 sanctions. (*Compare* DE 1, at 9, 24, 25, ¶¶58, 164, 166 *with* at DE 18-3 at 12, 14, ¶¶ 48, 59; DE 18-4 at 3-4, ¶¶10, 13, 19).

---

[8] Even if an independent cause of action could stand, the tort has a two-year statute of limitations and thus would not apply to the alleged breach in May 2022. *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct. App. 2003).

Moreover, Indiana law protects contracts from tortious interference by "***third*** parties." (DE 5 at 19). In *Trail v. Boys & Girls Clubs*, 845 N.E.2d 130, 138 (Ind. 2006), the Indiana Supreme Court held that a corporate party, including its officers, cannot interfere with its own contracts. Parseghian was a Trustee when she allegedly sought to impose CRND personnel decisions in 2008 to 2019. (DE 18-4 at 3, ¶7). Thus, even if those alleged wrongful actions happened, they would have been within the scope of her officer role, even if driven by personal animus.

Plaintiff's claims against Dean Schnell under this theory would fare no better. Dean Schnell acted in his capacity as Dean when he took employment actions against Plaintiff. He is not a third party, and thus could not be liable for tortious interference. *Trail*, 845 N.E.2d at 138. In addition, Plaintiff's claim directed at the 2022 Restrictions is time-barred and not actionable. *Alexander*, 2024 U.S. Dist. LEXIS 3421, at *7. Finally, presuming Plaintiff could overcome these hurdles, she must prove Dean Schnell was unjustified in taking action against her. *Id.* at * 8-9 (citing *Gov't Payment Serv., Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006)). The numerous substantiated complaints against Plaintiff justified Dean Schnell imposing the 2022 Restrictions, and the faculty grievance committee upheld his decision. Similarly, Plaintiff's continuing abusive conduct toward faculty, staff, students and donors validated Dean Schnell following through on his warning in 2022 and imposing further disciplinary action.

### 5. Plaintiff Is Not Likely to Succeed on the Merits of Her Discrimination Claims

As a threshold matter on the Title VII and ADEA claims, Plaintiff admits she has not exhausted her remedies as it pertains to the September 2024 restrictions (DE 1, at 4, ¶¶19, 20), and thus claims directed to the 2024 events are subject to dismissal.[9] *See Vassileva v. City of Chicago*,

---

[9] Similarly, Plaintiff contends the September 2024 restrictions were in retaliation for her grieving (unsuccessfully) the 2022 restrictions, at which time she alleged discrimination. (DE 1 at 21, ¶136). But again, Plaintiff has filed no EEOC Charge asserting a retaliation claim, and cannot do so now. *See also*, DE 1, at 4, ¶19 (bases for claims). Thus, there is zero chance at this time that Plaintiff could prevail on a retaliation claim under Title VII or the ADEA. Under Section

No. 23-1679, 2024 WL 4355403 (7th Cir. Oct. 1, 2024) (affirming judgment on 2019 promotion claim where EEOC charge was directed at 2018 promotion claim and filed before the 2019 denial of promotion occurred). Consequently, only the 2022 restrictions claims remain, but those do not involve closing Plaintiff's lab, which is the basis for her emergency relief request.

Also as a threshold matter, Plaintiff pleads her ADEA claim out of court by alleging that her age was a "motivating factor" in the actions at issue in her Complaint. (DE 1, at 27, ¶190). But to state a claim for discrimination under the ADEA, her age must be the "but for" factor. *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167 (2009). Her Section 1981 claim suffers from a similar defect in that Plaintiff has not plead that her race or national origin is the "but for" cause of the adverse actions. *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020).

Setting aside those procedural defects, Plaintiff's allegations in her Section 1981, Title VII and ADEA claims are thin at best. She refers to two alleged stray remarks by a non-decisionmaker, Defendant Parseghian, made nowhere close in time to the events in the Complaint: one comment made 16 years ago by Parseghian (DE 1 at 7, ¶46); and another allegedly made in 2019. (DE 1 at 8, ¶50). This is insufficient to prevail. *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 444 (7th Cir. 1997) (stray remarks are insufficient to establish a discrimination claim). Even if Parseghian's alleged comments could not be deemed stray, evidence of racial, national origin or gender bias cannot be inferred where the comments do not mention protected categories. *See, e.g., Anderson v. Follett Higher Educ. Group*, 2007 WL 1521534 at *65-66 (N.D. Ill. May 24, 2007) (plaintiff could not establish evidence of an unlawful animus when comments did not mention

---

1981, Plaintiff's claim would also fail out of the box because that internal grievance was made two years prior to the September 2024 restrictions, far too long of a temporal gap. *See, e.g., Carmody v. Board of Trs. of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014); *Lugo v. IBEW Local #134*, 175 F. Supp. 3d 1026, 1038 (N.D. Ill. 2016).

race). The only other comment she relies on is a benign one allegedly made by Dean Schnell several months before he removed her from the Director role and three years before decommissioning her lab. (DE 1 at 9, ¶56). Here, the two discussed and agreed upon a succession plan to implement over time, as Dean Schnell did with all of the College's Center Directors. (DE 18-3 at 8, ¶ 26). A single succession planning discussion that does not explicitly mention age cannot support an ADEA claim. *Beatty v. Wood*, 204 F.3d 713, 716 (7th Cir. 2000) (alleged offending comment must be ageist without inference); *Colosi v. ElectriFlex Co.*, 965 F.2d 500, 502 (7th Cir. 1992) (inquiring about retirement for future planning purposes is not direct evidence of age animus). Further weakening her claims is the grievance committee's consideration of the comments in 2022, concluding Plaintiff's discrimination claims were unsubstantiated and the 2022 restrictions were appropriate. (DE 4-5 and 4-6).

Plaintiff's only other evidence is that she is in four protected categories (over 40, Asian, female and Indian) that the decisionmakers and replacements do not occupy. Without more at this stage, Plaintiff has not established a strong likelihood of success on the merits under the *McDonnell Douglas* standard invoked by Plaintiff under either a "but for" or a "motivating factor" standard. First, in attempting to identify a comparator who was treated better, Plaintiff alleges that literally every other faculty member at the University is a comparator (DE 5 at 16), even though such group includes women, Asian, Indian nationals and older individuals and even though she has not identified a single person who has behaved in the same way she has, despite multiple opportunities to change. *Carouthers v. County of Cook*, 808 F.3d 1140, 1150 (7th Cir. 2015) (plaintiff must demonstrate "sufficient commonalities on the key variables" between herself and the would-be comparator). The same is true of the "white male professor in the Biological Sciences department" whom Plaintiff alleges engaged in bullying and abusive behavior. (DE 1 at 14, ¶91). Plaintiff does

not provide any information about whether this professor was given multiple warnings, and chose to reject any directives to modify the behavior. *Carouthers*, 808 F.3d at 1150-51 (plaintiff failed to provide sufficient information about his purported comparator). Nor does her allegation that her interim replacements in the CRND, Dean Schnell and Jason Rohr, Chair of the Department of Biology Sciences, were less qualified than her. Dean Schnell leads a research team that focused on developing methods and models that enhance the accuracy of biomedical measurements, with a particular emphasis on rare and complex diseases, and Dr. Rohr is recognized for his work involving neglected diseases. (DE 18-3 at 3 at ¶ 4; DE 18-3 at 12, ¶ 44).

Even so, the University has articulated legitimate, non-discriminatory bases for the actions taken, which Plaintiff cannot demonstrate are lies. *Vasquez v. Flserv CIR, Inc.*, No. 93 C 7817, 1995 WL 431249 at *10 (N.D. Ill. July 14, 1995) (no showing of pretext where employer demonstrated patience with belligerent behavior by extending multiple opportunities to correct). Plaintiff contractually agreed to abide by the University's policies at the commencement of her employment, but then behaved with impunity in contravention of the Respectful Environment Policy for years, despite receiving notice that her conduct did not meet the University's standards, and despite being provided with multiple opportunities to correct that behavior. While Plaintiff alleges that she disproved the legitimacy of the complaints in connection with her 2022 grievance, the grievance committee agreed with Dean Schnell, further legitimizing the action taken. Her inappropriate conduct, about which she was counseled in 2021 and disciplined in 2022, continued in her interactions with her colleagues (including an Indian female faculty member with whom Dean Schnell sided), her students, and even University donors. Plaintiff has no likelihood of success on these claims so as to warrant the extreme remedy of requiring the University to continue to fund her flagging research at the expense of the University's values, operations and policies.

**B.**    **Plaintiff Cannot Show That She Will Suffer Irreparable Harm**

Not only are Plaintiff's claims not likely to succeed on the merits, she also cannot show she will sustain irreparable harm in the absence of the requested TRO. To put her request for emergency injunctive relief into context, this is not the ordinary employment case. Plaintiff is not losing her job, she will retain her rank as a full professor, her salary remains intact, and she will continue to teach classes. *See Choudhry v. Regents of Univ. of Cal.*, No. 16-cv-5281, 2016 WL 6611067 (N.D. Cal. Nov. 9, 2016) (no irreparable harm where university dean remained a tenured, paid faculty member but had no teaching responsibilities during the pendency of a sexual harassment investigation). Her rank and title remain in place, her base salary remains intact, she will continue to teach, as faculty are expected to. The only thing that is changing is that the University will be closing her lab effective December 12, 2024. (DE 5 at 25).

In any event, Plaintiff marches out a parade of horribles that will purportedly result from the lab's closure. In particular, she argues that if these things come to pass, she will lose biological samples developed for her experiments, and it would allegedly take years to regenerate those samples, effectively ending her career as a research scientist. (DE 5 at 21-22; DE 16 at 2).

***Even if all of this were true (and it simply is not), Plaintiff would not be entitled to the relief she seeks.*** Contrary to Plaintiff's assertions, the requested TRO is not necessary to ensure the preservation of the biological materials used in her experiments. The University has already advised Plaintiff it is willing to preserve that biological material until the Court can decide whether she is entitled to a preliminary injunction. [DE 18-2 at 2-3, , ¶¶3-4]. Likewise, the University offered to pay for cryopreservation of embryos and/or semen of the mice bred for Plaintiff's experiments,[10] which are not even bred in her lab but at the University's Friemann Life Sciences

---

[10] As one abstract recognized in May 2021, "Cryopreservation of [genetically engineered mice ("GEMs")] is critical in preserving them for future use due to changes in research priorities, breeding problems and unanticipated crises of

Center (the "FLSC"). (*See* DE 18-2 at 2-3, ¶4; DE 18-1 at 3, 5, ¶¶5, 15). Moreover, Plaintiff overstates the delay in conducting research on the mice, which should be no longer than eight months. (DE 18-3 at 15, ¶ 61). Plaintiff faces no irreparable harm. *See Hornig v. Trs. of Columbia Univ.*, No. 17-3602, 2018 WL 5800801 (S.D.N.Y. Nov. 5, 2018). In *Hornig*, the plaintiff professor sought an injunction to preserve her research data. *Id.* at *6. The court declined to issue an injunction because the plaintiff failed to demonstrate irreparable harm that was "actual and imminent" where the university had agreed to give the plaintiff one week advance notice of destruction of her research samples.[11] *Id.* at *5-6.

In addition, Plaintiff fails to note that she has the option of going to another institution and taking the samples with her. In fact, on October 2, 2024, the Director of the FLSC, Iris Bolton, met with Plaintiff to discuss whether she wanted to transfer the mice used in her experiments to another lab. [DE 18-1 at 3-4, , ¶¶9, 10]. Thus, contrary to Plaintiff's assertions, the closure of the lab will not result in irreparable harm if she takes her samples and research elsewhere. This possibility undermines her request for emergency injunctive relief. *See, e.g., Ahmad v. Long Island Univ.*, 18 F. Supp. 2d 245, 248-49 (E.D.N.Y. 1998) (denying preliminary injunction in part because plaintiff had option of continuing his research at another university). While possible that Plaintiff does not have the option to take her science to another institution, the Seventh Circuit has recognized that irreparable injury does not include the inability to find other employment. *EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980); *see also Halikas v. Univ. of Minn.*, 856 F. Supp. 1331 (D. Minn. 1994) (reputational harm resulting from university's suspension of professor's

---

natural and manmade disasters. [Citations omitted]. … Cryopreservation has been proven to preserve GEMs for over 40 years. [Citations omitted]. … With proper storage and handling frozen embryos and sperm can potentially last forever. [Citations omitted]." G. Longenecker, K. Cho, J. Khillan, A. Kulkarni, "Cryopreservation Protocols for Genetically Engineered Mice," https://pmc.ncbi.nlm.nih.gov/articles/PMC8211118/pdf/nihms-1708577.pdf (last vis. Oct. 19, 2024).

[11] The lab need not remain open and the University need not fund Plaintiff's ongoing research to ensure preservation of the biological samples. (*See* DE 18-1 at 5, ¶15).

research "is not the kind of irreparable harm which may be remedied by injunctive relief"); *Brown v. Dist. of Columbia*, 888 F. Supp. 2d 28, 31-32 (D.D.C. 2012) (denying preliminary injunction and rejecting as "irreparable harm" professor's claim her career would end and reputation would be harmed). And, to the extent Plaintiff cannot take her research elsewhere because no other institution will support it, that only bolsters the University's decision to close the lab and reflects on the merits of her claims. Indeed, the restrictions that the University placed on Plaintiff related to her lab and research have no bearing on Plaintiff's ability to move to another institution (DE 16 at 2-4); she has not obtained a grant award from the NIH since 2016, and it is that lack of funding – which long predates the restrictions – that makes her science unsustainable.[12]

The Motion also ignores other facts undermining Plaintiff's claim that irreparable harm will result if the Court does not act immediately. The University intends to keep Plaintiff's lab open for the remainder of the semester, until December 12, 2024. [DE 4-7 at 8]. Under Rule 65(b), a TRO is intended to preserve the status quo for a short period of time (no more than 14 days absent an extension for good cause or agreement by the parties).[13]

Moreover, Plaintiff seeks to change the *status quo* rather than preserve it. Plaintiff was told on October 2, 2024 that the mice would be segregated (i.e., separated into homogenous gender groups so they cannot breed) as of October 11, 2024. (DE 4-12 at 5; DE 16 at 2-3). Cessation of breeding was ethically necessary in that: (1) the mice colonies were bred for Plaintiff's experiment and cannot be used in other studies; and (2) the FLSC's protocol does not allow for breeding of animals only for the offspring to be euthanized without use. [DE 18-1 at 2-3, ¶¶ 4, 5, 6].

---

[12] Plaintiff appears to claim that the University's 2022 restrictions prevented her from applying for federal funding, which in turn prevents her from moving her lab to another institution. (DE 4-13, at 2-3, ¶¶4-6). However, this is not a basis for granting a TRO or preliminary injunction, given that these restrictions have been in place for over two years.

[13] The University contends that Plaintiff is likewise not entitled to a preliminary injunction for the same reasons set forth herein.

Despite receiving notice nine days earlier that the mice would be segregated, Plaintiff waited until October 11, 2024 (the date on which the segregation was planned) to file the Motion. Not surprisingly, then, the segregation proceeded. However, the mice were allowed to breed until they were segregated, which means that – given the gestational period and required weaning time – Plaintiff should have mice for testing at least until the University closes her lab. [DE 18-1 at 4-5, ¶13]. And, while the University does not have any immediate plans to euthanize the segregated mice, any order that would require it to allow further breeding would be inappropriate in that it would change – not maintain – the *status quo*. Plaintiff makes that more clear when she argues that a ban on hiring must be lifted by January 1, 2025, after her lab is set to close. (DE 16 at 4). Most incredibly, Plaintiff seeks affirmative relief (the University "must restore the [] donor funds.") (De 16 at 3.) The Seventh Circuit has warned that mandatory injunctions should be "sparingly issued." *Graham v. Medical Mut. Of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997).

Further, it makes no difference whether third parties will be harmed if the Court does not prohibit the University from closing her lab. (DE 16 at 4). In order to obtain injunctive relief, Plaintiff must show that she – not someone else – would suffer irreparable harm in its absence. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). It is only when that showing has been made that a court considers how the injunction would impact others, "weighing the harm to the moving party if the requested injunction is denied against the harm to the nonmoving party and the public – including third parties – if it is granted." *Id.* Thus, this Court should disregard Plaintiff's assertion that the closure of her lab is a "significant blow to the rare disease research community" and will impact her Ph.D. student. (DE 5, pp. 9, 24). This is especially true because the University offered this Ph.D. student another lab to finish his work. (DE 16 at 2).

**C.**     **Plaintiff Cannot Show She Has An Inadequate Remedy At Law**

Plaintiff's request for emergency injunctive relief fails on yet another basis. While Plaintiff devoted sections of her brief to arguing the other elements of her claim (including the likelihood of success on the merits and irreparable harm (DE 5 at 10-22)), she does not address whether she has an adequate legal remedy, arguably waiving the point. *Dirig v. Wilson*, No. 3:12-CV-549 WL, 2013 WL 2898276, at *1 (N.D. Ind. June 12, 2013) (citing *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation,* 430 F.3d 432, 437 (7th Cir. 2005)). Rather, a single sentence appears in her discussion of irreparable harm, that a ten-year "moratorium" on her research is not "a harm that could be remedied at the close of the litigation." (DE 5 at 22). This is not the case for several reasons.

In the first instance, Plaintiff glosses over a key consideration. The Seventh Circuit has recognized on a number of occasions that preliminary injunctive relief is "disfavored in the employment context." *Anderson v. U.S.F. Logistics (IMC), Inc.,* 274 F.3d 470, 474-75 (7th Cir. 2001). In fact, the court has observed that "interlocutory relief in employment-discrimination cases should be rare." *Hetreed v. Allstate Ins. Co.,* 135 F.3d 1155, 1158 (7th Cir. 1998) (citing *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1453 (7th Cir. 1995)).

Courts do not favor preliminary injunctive relief in employment cases for at least two reasons. First, "[b]y its very nature, injunctive relief is an extreme invasion of an employer's prerogatives." *Anderson v. U.S.F. Logistics (IMC), Inc.,* No. IP 00-1364 TG, 2001 WL 114270, at *8 (S.D. Ind. Jan. 30, 2001), *aff'd,* 274 F.3d 470 (7th Cir. 2001). As the Seventh Circuit repeatedly recognized, it is not the role of a court to "sit as a kind of 'super-personnel department' weighing the prudence of employment decisions." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001) (citations omitted); *Univ. of Pa. v. EEOC,* 493 U.S. 182, 198-99 (1990) ("[C]ourts stressing the importance of avoiding second-guessing of legitimate academic judgments."). Second, employment-related claims under statutes like Title VII, the ADEA and Section 1981

provide a broad range of remedies to successful plaintiffs, including, for example, reinstatement, back pay, front pay, and compensatory damages – which makes it difficult for plaintiffs to show a lack of adequate legal remedy. *See, e.g., Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (citing 28 U.S.C. § 1981a(b)(2); 42 U.S.C. § 2000e-5(g)(1)).

Against this backdrop, Plaintiff utterly fails to show she is entitled to the extraordinary relief she seeks. The focus is on whether Plaintiff – not someone else – has an adequate remedy at law. *See, e.g., Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("In every case in which the plaintiff wants a preliminary injunction **he must show that he** has 'no adequate remedy at law' … ") (emphasis added). Here, Plaintiff alleges she has already "sustained … lost wages, injury to professional reputation and career opportunities, and emotional distress" as a result of the University's alleged actions. (DE 1 at 20, ¶129). Should she sustain any further harm, it will be of the same nature and thus redressable with money damages.

Plaintiff claims "a moratorium of close to a decade on her research" – an unfounded overstatement given the offers to freeze her biological materials and the fact that a colony of mice could be bred in less than eight months – is not a harm that can be remedied because it will end her career as a "research scientist." (DE 5 at 22). That is not sufficient to order the University to keep her lab open beyond December 12. Rather, Plaintiff's harmed reputation and distress about her research winding down is ***exactly*** the type of injury that can be addressed with money damages under these civil rights statues. *See Bagley v. Yale Univ.*, No. 3:13–cv–1890, 2014 WL 7370021, at *5-6, 10 (D. Conn. Dec. 29, 2014) (finding reputational harm in academia to be speculative and compensable by money damages at trial); *Valcourt v. Hayland*, 503 F. Supp. 630, 635 (D. Mass. 1980) (money damages, rather than injunctive relief, could adequately remedy plaintiff's career ending termination). Moreover, Plaintiff fails to acknowledge her employment is not only ongoing,

but she remains a tenured professor with no reduction in salary. Therefore, unlike the plaintiffs in the cases upon which she relies (DE 5 at 22), Plaintiff continues to have an academic career.

### D.    To The Extent It Is A Factor For Consideration At All In This Case, The Balance Of Harms Favors The University And The Public

Plaintiff finally argues that the balance of harms favors the entry of emergency injunctive relief in this case. A court only looks at the balance of the harms if the moving party first shows that she: (1) has some likelihood of succeeding on the merits, (2) has no adequate remedy at law, and (3) will suffer irreparable harm if the order is denied. (DE 5 at 9). *See also Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992). Only then does the Court consider "any irreparable harm to the non-movant" and balance it against the harm to the movant if the requested relief is denied. *Baskin v. Bogan*, 12 F. Supp. 3d 1137, 1140 (S.D. Ind. 2014). In this circuit, courts evaluate the balance of harms on a sliding scale so that if a plaintiff is less likely to succeed on the merits, "[she] must make a compelling argument concerning the balance of harms." *Chicago Teachers Union v. DeVos*, 468 F. Supp. 3d 974, 991 (N.D. Ill. 2020) (citing *Girl Scouts of Manitou Council, Inc. v Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1096 (7th Cir. 2008) (abrogation on other grounds recognized by *Pritzker,* 973 F.3d at 762-63)); *see also Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.,* 735 F.3d 735, 740 (7th Cir. 2013).

Here, Plaintiff has utterly failed to meet her burden with respect to the entry of the requested TRO, because she has not shown she is likely to succeed on the merits of her claims, nor has she demonstrated any irreparable harm that will be prevented by a TRO. Moreover, even if a basis exists for finding that Plaintiff can demonstrate her claims have at least some merit, Plaintiff has not demonstrated that the balance of harms in her favor is "compelling."

As discussed above, Plaintiff's legal remedies are more than sufficient to redress any harm to her. She is not losing her job, her tenure, her rank or salary. She will remain employed at the

University as a full professor. If this Court denies the TRO, the University will nevertheless preserve the biological samples until this Court rules on Plaintiff's request for a preliminary injunction. Her lab will remain open until the end of the semester, giving her more than enough time to obtain a ruling on her request for preliminary injunction. In other words, the harm that will result to Plaintiff if a TRO is not entered is miniscule at best.

In contrast, entering a TRO will harm the University. As courts have recognized, it is entitled to exercise its academic judgment as it sees fit. *See, e.g., Univ. of Pa. v. EEOC,* 493 U.S. 182, 198-99 (1990) ("[C]ourts have stressed the importance of avoiding second-guessing of legitimate academic judgments."). Courts also recognize employers' managerial rights to make employment decisions. *O'Regan*, 246 F.3d at 984. Awarding Plaintiff a TRO will impermissibly impinge upon those rights, given that the University will not close Plaintiff's lab until December 12. This same argument holds true for a preliminary injunction, since the biological materials can be preserved past the date of the lab closing. Just as importantly, the University would suffer harm if it were compelled to continue to allow Plaintiff to operate a lab when her track record demonstrates that she cannot do so in accord with the University's expectations regarding respectful workspaces or research productivity. (DE 18-3 at 5, 10, 14, ¶¶ 15, 37, 55). Tolerating Plaintiff's conduct would signal to the University community that such conduct is acceptable, which puts the University's reputation at substantial risk. (*Id.* at 15, ¶ 62). Just as importantly, if the Court were to award the "affirmative" relief of requiring the University to fund her research when federal agencies have not for the last eight years, her research would divert valuable resources from other faculty conducting promising studies with significant potential.

By the same token, Plaintiff cannot show that the public interest weighs in favor of the requested preliminary relief. She claims that the closure of her lab will be a "significant blow to

the rare disease research community" (DE 5 at 9), but the facts do not support her claim. Plaintiff's argument ignores that her research has not progressed as it should have, something evidenced by her inability to obtain third-party funding (the norm for scientific research such as hers) since 2016. (DE 18-3 at 11, 16, ¶¶ 43, 63). In addition, Plaintiff is not the only person researching treatments for rare and neglected diseases, including the three she mentions, NKH, Niemann Pick Type C ("NPC") and malaria (DE 5 at pp. 7, 23). For example, even at the University, others not in her laboratory, including Professor Christian Koepfli and Research Professor Neil Lobo, are working on eradicating malaria in Bangladesh. *See* Cristian Koepfli Biography, https://biology.nd.edu/people.christian-koepfli/, and Neil F. Lobo Biography, https://biology.nd.edu/people.neil-f-lobo/ (last visited Oct. 20, 2024).

Others also are working on NKH and NPC. The website of the Foundation for Nonketotic Hyperglycemia lists two ongoing research programs other than Plaintiff's, including one led by Professor Nick Greene at the University College of London and one led by Dr. Johan Van Hove at the University of Colorado. *See* "Current Research | The Foundation for Nonketotic Hyperglycinemia," https://foundationnkh.org/research/current-research/ (last visited Oct. 20, 2024). The University itself has other experts researching NPC, and on September 25, 2024, the U.S. Food and Drug Administration "announced the first approved treatment for [NPC]," a development that Plaintiff completely fails to acknowledge. *See* "ND Expert Sean Kassen: Statement on First FDA-approved Treatment for Niemann-Pick Type C Disease," https://raredisease.nd.edu/news-events/news/nd-expert-sean-kassen-statement-on-first-fda-approved-treatment-for-niemann-pick-disease-type-c/ (last visited October 20, 2024).

## IV.    CONCLUSION

As discussed above, there is no emergency here. Plaintiff's Emergency Motion for Temporary Restraining Order and Preliminary Injunction should be denied.

Dated: October 23, 2024                              Respectfully submitted,


                                                     s/ Michael P. Palmer_____
                                                     Anneliese Wermuth
                                                     awermuth@cozen.com
                                                     Cozen O'Connor
                                                     123 North Wacker Drive, Suite 1800
                                                     Chicago, Illinois 60606
                                                     (312) 474-7876

                                                     Michael P. Palmer (#25199-71)
                                                     V. Chisara Ezie-Boncoeur
                                                     (#37251-71)
                                                     Barnes & Thornburg LLP
                                                     201 S. Main St., Suite 400
                                                     South Bend, IN  46601-2130
                                                     Direct: (574) 237-1135
                                                     Facsimile:  (574) 237-1125
                                                     Email:  cezie@btlaw.com

                                                     Attorneys for Defendants
                                                     University of Notre Dame du Lac,
                                                     Santiago Schnell and Cindy
                                                     Parseghian

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been electronically filed this 23rd day of October, 2024, with a copy served on all counsel of record via CM-ECF.

*/s/ Michael P. Palmer*
Barnes & Thornburg LLP
