UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KASTURI HALDAR,

     Plaintiff,

     v.                                                      Case No. 3:24-CV-836-CCB-SJF

UNIVERSITY OF NOTRE DAME DU
LAC, et al.,

     Defendants.

## OPINION AND ORDER

Pending before the Court is Plaintiff Kasturi Haldar's ("Dr. Haldar's") Motion for Temporary Restraining Order and Preliminary Injunction. [DE 4]. Following expedited briefing, the court heard oral argument on October 28, 2024. [DE 24]. Based on the applicable law, facts, and arguments, Plaintiff's motion for temporary restraining order and preliminary injunction will be denied.

## I.    RELEVANT BACKGROUND

The facts as presented here are taken from Dr. Haldar's Verified Complaint [DE 1], her affidavit [DE 4-13] and supplemental affidavit [DE 22-1], Defendant Santiago Schnell's affidavit [DE 18-3], other affidavits and exhibits attached to the Verified Complaint, and the briefing of the pending Motion for Temporary Restraining Order and Preliminary Injunction.

Dr. Haldar, a citizen of Illinois, is a 67-year-old Asian woman of Indian national origin and a tenured professor in the Department of Biological Sciences, College of Science, at Defendant University of Notre Dame. [DE 1 at 3, 4]. Dr. Haldar began her service at Notre Dame in August 2008 after holding tenured positions at Stanford University and Northwestern University. [*Id.* at 4]. Dr. Haldar's hiring at Notre Dame is memorialized in an Offer Letter from the Dean of the College of Science dated March 20, 2008 [DE 1-1], and an Appointment Letter from the Provost dated April

8, 2008 [DE 1-2]. The Appointment Letter included the amount of Dr. Haldar's nine-month base salary, appointed her to an endowed professorship, and incorporated by reference the University's Academic Articles, which together with the Appointment Letter constitutes Dr. Haldar's Faculty Contract. [*Id.*]. Dr. Haldar was also named Director of the University's new Center for Rare and Neglected Diseases ("CRND")[1], an administrative position for which she received a summer stipend depending upon the availability of funding. [DE 1-1, 1-2, 18-3 at 7]. In a reappointment letter dated July 29, 2014, Dr. Haldar was renewed as Director of the CRND from July 1, 2014, and through June 30, 2017, stating that she would be "serving at the pleasure of the Dean of the College of Science." [DE 1-4 at 2]. No subsequent reappointment letter was ever issued, but Dr. Haldar continued to serve as the CRND Director after 2017.

Dr. Haldar's work at the University and in the CRND has included running a laboratory where she conducts research regarding Non-Ketotic Hyperglycinemia ("NKH"), Kabuki Syndrome, and malaria. [DE 22-1 at 3]. Dr. Haldar's malaria research is a continuation of work she started before coming to the University and was supported by grants from the National Institutes of Health ("NIH") until 2021. [*Id.* at 6]. After 2021, Dr. Haldar used the discretionary fund associated with her endowed professorship to support her malaria work while applying for new federal funding. [*Id.* at 8]. According to Dr. Haldar, research into NKH and Kabuki is rarely, if ever, supported by NIH grants; therefore, she solicited donations for this research and maintained relationships with the donors, who were typically families of patients suffering from these diseases. [*Id.* at 3].

For her research into NKH and Kabuki, Dr. Haldar and her staff bred and genetically engineered two separate mice colonies. [DE 4-13 at 6]. Getting the NKH mice ready for experimentation took about 4 years while it took about 12-26 months to get the Kabuki mice ready

---

[1] The University reports that this Center is now known as the Boler-Parseghian Center for Rare Diseases, but that for most of Dr. Haldar's tenure it was known as the CRND. [DE 19 at 2]. Therefore, this Opinion and Order refers to the Center as the CRND.

for experimentation.  [*See id.*].  Experiments have produced promising results leading to publications and two patents.  [*Id.* at 4; DE 22-1 at 9, 11].  Similarly, development of the reagents central to Dr. Haldar's research on drug resistant malaria parasites took about 5-7 years.  [*See* DE 4-13 at 7].  The resulting research has contributed to efforts to eliminate malaria in Bangladesh by 2030.  [*Id.* at 8].  Dr. Haldar's work regarding malaria in Bangladesh has been highlighted in the press and scientific publications and has been lauded in affidavits by two non-party scientists.  [DE 4-14; DE 4-15; DE 22-3].

Several faculty, research assistants, undergraduate students, and graduate students have been part of Dr. Haldar's lab.  Dr. Haldar has come to rely upon one Ph.D. student in particular, Alejandro Lopez Ramirez, who has perfected the brain surgery on the mice necessary for the lab's experiments.  [DE 22-1 at 16].  To keep the research going, Dr. Haldar will need to hire and train Mr. Lopez's replacement when he completes his Ph.D., which is expected in 2025.  [*Id.* at 16–17].

On September 1, 2021, while Dr. Haldar was still serving as Director of the CRND, Defendant Santiago Schnell was appointed Dean of the College of Science.  [DE 18-3 at 2].  Later that month, Dean Schnell met with Dr. Haldar, as he did with the directors of all the College's Centers, to discuss succession planning.  [*Id.* at 8].  The parties disagree about the exact language Dean Schnell used in the meeting, but Dr. Haldar confirmed the results of the meeting in an email to Dean Schnell on November 14, 2021, with the subject line "Transition_re Meeting Sept 29th":

> I've given considerable thought to your preferred option of recruiting at the Associate Professor level and then grooming the individual to transition as Director of CRND.
>
> Taking all factors into account, I agree it is the best option and I'm glad to help move forward.

[DE 22-6 at 2].

After that Dean Schnell began receiving complaints from personnel in Dr. Haldar's lab about long working hours and inability to take vacations or time off.  [DE 18-3 at 8].  One

complaint came from a female, Asian, Indian national faculty member who reported that Dr. Haldar threatened to terminate her position if she traveled to India to attend her sister's wake. [*Id.*]. Dean Schnell and an Associate Dean met with Dr. Haldar on November 3, 2021, to discuss the complaints and explain the College's expectations for supervising lab personnel and maintaining clear policies. [*Id.*]. Dean Schnell documented the stated expectations in a letter to Dr. Haldar dated November 29, 2021. [DE 4-1]. Specifically, Dean Schnell directed her to (1) "establish written policies for working regular hours and vacations;" (2) "provide consistent mentoring . . . for all of your laboratory personnel;" (3) "treat your research team members with respect and compassion;" and (4) never engage in any form of retaliation to past, current, or future lab personnel for reporting their concerns. [*Id.*]. Dean Schnell warned Dr. Haldar that "failure to meet these expectations could impact [her] privileges to mentor students and postdoctoral scholars, hire research staff, or appoint research professors in [her] laboratory [and could subject her] to severe sanctions as outlined in Article IV/Section 9 of the *Academic Articles*." [*Id.*].

A subsequent investigation of complaints from Dr. Haldar's lab was conducted by the University's Office of Institutional Equity ("OIE") resulting in a report dated February 3, 2022. [DE 25-1]. The parties dispute whether Dean Schnell or the Associate Provost for Faculty Affairs ("Associate Provost") directed OIE to investigate Dr. Haldar's lab. [*Compare* DE 1 at 11, *with* DE 18-3 at 9]. Nevertheless, the OIE investigator interviewed eleven individuals who had either worked in the lab as far back as 2016 or were currently working for the lab. [DE 18-3 at 99]. Dr. Haldar was given the opportunity to be interviewed but refused choosing to respond to the interviewer only in writing. [DE 4-2 at 2]. The interviewees requested anonymity fearing retaliation from Dr. Haldar if she knew they were complaining about their experience in the lab. [DE 18-3 at 99]. The OIE investigator reported complaints by interviewees of a toxic work environment where Dr. Haldar yelled, humiliated, and insulted people in lab meetings; got angry at employee mistakes; and

micromanaged employes causing them fear and even health problems. [*Id.* at 100–01]. The interviewees also noted long hours, inability to take time off, pressures to work weekends, and a lack of mentorship and training from Dr. Haldar. [*Id.* at 101–02]. Instances of manipulating employee vulnerabilities such as visa status as well as inappropriate comments regarding employee personal matters were also reported. [*Id.* at 103].

Based on this report, Dean Schnell concluded that Dr. Haldar violated the University's Respectful Environment Policy. [DE 18-3 at 10]. The Policy is maintained on the University's website, is applicable to faculty and staff, and provides:

> The University of Notre Dame is committed to its <u>core values</u> of accountability, teamwork, integrity, leadership in excellence, and leadership in mission. As such, Notre Dame staff and faculty members are expected to treat members of the University community with dignity and respect, recognizing that diversity of thought and informed debate are valued in an academic setting.

[DE 18-3 at 85]. The Policy includes a section describing how the Policy is enforced as follows:

> The University will not tolerate demeaning, intimidating, humiliating, or hostile behavior that would negatively impact a reasonable person's ability to learn or work in the University environment, and that has such an impact on a Notre Dame community member. Such behaviors have no place in the academic community. Staff and faculty members who engage in such unacceptable behavior may be subject to disciplinary action, up to and including termination, consistent with Notre Dame disciplinary policy and procedures.

[*Id.*].

On May 10, 2022, Dean Schnell sent a letter to Dr. Haldar outlining her response to his November 2021 concerns, the results of the OIE investigation, and his conclusion that she violated the Respectful Environment Policy. [DE 4-2 at 2–3]. In the letter, Dean Schnell acknowledged that Dr. Haldar viewed conditions in her lab and her interactions with the lab employees differently. [*Id.*]. Dean Schnell also removed Dr. Haldar as Director of the CRND; restricted her from hiring new lab staff; required another faculty member to co-advise graduate and postdoctoral students in the lab; prohibited her from accepting new faculty, postdoctoral fellows, research staff, graduate

students, or other researchers under her supervision; prohibited her from advising undergraduate theses and research, and denied her access to 21 donor funds (collectively "the 2022 Restrictions"). [*Id.* at 3–4]. Dean Schnell advised Dr. Haldar that the 2022 Restrictions would be reviewed in three years and could be increased "up to and including restricting [her] eligibility to serve as a Principal Investigator (PI) or co-Principal Investigator (co-PI) on any new grants or contracts" if the concerning conduct continued. [*Id.* at 4–5]. Dr. Haldar was, however, allowed to retain use of the discretionary fund associated with her endowed professorship and to request funds for her NKH research from the CRND Director. [*Id.* at 4]. Dean Schnell became interim Co-Director of the CRND with another tenured professor and department chair from the College. [DE 18-3 at 12]. The co-Directors are both white men who are younger than Dr. Haldar. [DE 1 at 13].

On July 18, 2022, Dr. Haldar filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging that the University's actions up to and including imposition of the 2022 Restrictions constituted discrimination on the basis of race, national origin, gender, and age. [DE 1 at 4, DE 22-4]. On October 8, 2024, the EEOC issued Dr. Haldar a right to sue letter. [DE 1 at 4; DE 26].

On December 20, 2022, Dr. Haldar submitted a faculty grievance related to the 2022 Restrictions consistent with procedures in the Academic Articles. [DE 4-3]. After their own investigation, the grievance committee delivered a report to the Associate Provost on March 15, 2023, recommending that all the 2022 Restrictions remain in place finding support for the conclusion that Dr. Haldar violated the Respectful Environment Policy. [DE 25-2 at 18]. The committee also noted that Dr. Haldar's interactions with them seemed to mimic the concerning behavior reported by her lab personnel. [*Id.* at 4]. Concerned about aspects of the University's handling of Dr. Haldar's case, the committee recommended that administrative protocols for triggering renewal or dismissal procedures for the Directorship of the CRND be established; that

Dean Schnell exhibit greater transparency in addressing concerns with accused faculty members; that Dean Schnell meet with accused faculty if requested so they can respond to such concerns; that Dr. Haldar given the opportunity—and allow herself the opportunity—to speak with the OIE investigator to understand the allegations against her and how to reshape her leadership style; and that the Respectful Environment Policy be incorporated into the Academic Articles. [*Id.* at 19].

Dr. Haldar continued her research in her lab after the 2022 Restrictions were imposed. Experiments on the NKH mice began in June 2023. [DE 22-1 at 10]. Access to donor funding for continued mice breeding and experiments ended in November 2023. [*Id.*]. In February 2024, Dr. Haldar communicated with donors about the status of funding and the research. She states that the donors were upset to hear that funding had been cut off while Dean Schnell describes reports from the donors that Dr. Haldar harassed them at all hours with requests for more money to support the research. [*Compare* DE 4-13 at 4, *with* DE 18-3 at 12]. Citing donor complaints of harassment, the Associate Provost sent Dr. Haldar a letter on February 28, 2024, directing her to cease contacting all University benefactors until further notice and not to attend the rare disease research conference being held at the University that week. [DE 4-6 at 2]. The letter warned that failure to observe these restrictions could result in further restrictions on her research or other disciplinary action. [*Id.*].

Dean Schnell then became aware of a "letter" submitted in the University's name to the U.S. General Services Administration in March 2024 for registration of an account ("SAM.gov") used by government contractors to conduct business with the United States Government. [DE 25-3; *see also* DE 18-3 at 13]. The University already had a SAM.gov account for, among other functions, transmission of grant proposals and any resulting federal funding. [DE 18-3 at 13]. The March letter was signed by a technician in Dr. Haldar's lab falsely identified as the University's Director of Government Contracting with Dr. Haldar's email address in the signature block. [DE 25-3]. The

letter designated Dr. Haldar as the "Entity Administrator." [*Id.*]. According to Dean Schnell, Dr. Haldar directed the technician to submit the letter but did not notify any University administrator about the submission thereby jeopardizing the University's work as a federal contractor. [DE 18-3 at 13].

In June 2024, Dean Schnell received another complaint about Dr. Haldar from a former faculty colleague of hers who had left the lab due to her alleged abusive conduct. [*Id.*]. The colleague and Dr. Haldar had worked on malaria research together, and both had been advised that they had equal right to produce new scholarly work based on their shared research. [*Id.* at 13–14]. The colleague complained that after she proposed adding Dr. Haldar's name to an abstract, Dr. Haldar responded with surprise that the colleague was continuing her work on the topic and asked for access to the results to determine "where we go from here." [*Id.* at 14].

Based on these new and other concerns about Dr. Haldar's conduct since the 2022 Restrictions were imposed and her decreased research productivity in terms of funding and publications, Dean Schnell decided that Dr. Haldar's lab had to be decommissioned. [*Id.*]. He notified Dr. Haldar of his decision in a letter dated September 6, 2024. [DE 4-7]. The letter detailed the history of Dr. Haldar's conduct, her failure to comply with multiple admonitions, and her concerning behaviors since the 2022 Restrictions were imposed then delineated additional restrictions on Dr. Haldar's work. [*Id.*]. The 2022 Restrictions were made permanent. [*Id.* at 8]. Dr. Haldar was prohibited from supervising faculty, staff, scholars, and students at all levels and from serving as a PI or co-PI. [*Id.*]. Dr. Haldar was told that her lab would be closed at the end of the semester on December 12, 2024, at which time her teaching responsibilities would be increased to account for the changes in her research responsibilities. [*Id.*]. The discretionary fund associated with Dr. Haldar's endowed professorship and three other funds related to Dr. Haldar's research were closed immediately leaving her access to one fund through December 12, 2024. [*Id.* at 9].

Neither Dr. Haldar's academic rank as a full, tenured professor nor her salary connected to that rank were changed however. [DE 18-3 at 15].

On September 16, 2024, Dr. Haldar sent Dean Schnell a letter pursuant to Academic Article IV/Section 12 to attempt informal resolution of her disagreement with his decision to close her laboratory. [DE 4-9]. Dr. Haldar describes the information in Dean Schnell's September 6th letter as incorrect and incomplete and attributes the decrease in funding and publications to the 2022 Restrictions. [*Id.*]. She also presents differing perspectives on the events Dean Schnell relied upon in making his decision including the faculty member's travel to India for her sister's wake, donor communications, the SAMS.gov account letter, and her former colleague's collaboration request. [*Id.*]. On October 8, 2024, Dean Schnell sent an email to Dr. Haldar confirming that he had reviewed her letter but remained firm in his determination to close the lab. [DE 4-10]. He then informed her that she could proceed with a faculty grievance under the Academic Articles. [*Id.*].

Dr. Haldar submitted her faculty grievance on October 10, 2024. [DE 4-11]. She reiterated allegations made in her 2022 grievance that she has been targeted for removal from the CRND by Dean Schnell since his arrival in 2021. [*Id.*]. She alleged that Dean Schnell manufactured performance issues, refused to provide her with information substantiating his claims against her, ignored information she provided him regarding those issues, and failed to follow University policy. [*Id.*]. Accordingly, Dr. Haldar argued that Dean Schnell and the Associate Provost violated the University's policies and her Faculty Contract. [*Id.*]. She also argued that Dean Schnell's decision to close her lab continues his "discriminatory decision to remove [her] from Notre Dame to appease [Defendant, and former University Trustee,] Cindy Parseghian." [*Id.* at 7]. Dr. Haldar references an alleged comment by Ms. Parseghian in 2008 that she wanted someone else, who was a white man, to be the first director of the CRND, and a second alleged comment in 2019 that she wanted Dr. Haldar out because she "did not represent 'her' (Parseghian's) Notre Dame." [DE 1 at 7–8]. She

also contends that the 2022 Restrictions were disproportionate and discriminatory sanctions compared to treatment of male PIs at the University facing complaints about their lab environments. [*Id.* at 8].

Based on the same alleged facts, Dr. Haldar filed her Verified Complaint in this Court on October 11, 2024.  Dr. Haldar raises claims against all Defendants for race discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count I); breach of her Faculty Contract against the University (Count II); breach of good faith and fair dealing against the University (Count III); tortious interference with contract against Defendant Parseghian (Count IV) and against Dean Schnell (Count V); discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, against the University (Count VI); and discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, against the University (Count VII).  Through the instant Motion for Temporary Restraining Order and Preliminary Injunction, Dr. Haldar asks this Court to issue an injunction prohibiting the University from imposing the restrictions listed in Dean Schnell's September 6, 2024, letter and ordering the University to take the steps necessary to return Dr. Haldar and her lab to the state they were in before those restrictions went into effect.  The parties have fully briefed the instant motion and have filed affidavits and documentary evidence in support of their respective positions.  With the benefit of oral argument on October 28, 2024, the Court turns to the merits of Dr. Haldar's motion.

## II.    PRELIMINARY MATTERS

### A.    Subject Matter Jurisdiction

Subject matter jurisdiction exists under 28 U.S.C. § 1331 based on Dr. Haldar's federal discrimination claims.  This Court then retains supplemental jurisdiction over Dr. Haldar's state and common law claims under 28 U.S.C. § 1367.

### B.    Temporary Restraining Order

Federal Rule of Civil Procedure 65 governs both temporary restraining orders and preliminary injunctions.  When entered, a temporary restraining order expires no more than 14 days after a court issues the order unless an extension for good cause is granted or the parties consent to an extension.  Fed. R. Civ. P. 65(b)(2).  At oral argument, the parties agreed that more than 14 days had passed since October 11, 2024, when Dr. Haldar filed her motion for injunctive relief, that substantial briefing had ensued accompanied by submission of affidavits and exhibits, and that the parties had been given adequate opportunity to develop legal and factual issues.  The University also confirmed on the record its efforts and intended efforts to preserve Dr. Haldar's biological materials.  The University stated that the lab handling Dr. Haldar's mice colonies has been instructed not to euthanize any of the breeding mice without further authorization.  [*See* DE 18-2].  Additionally, the University confirmed that it has agreed to pay to cryopreserve the mice embryos and semen used in Dr. Haldar's NKH and Kabuki research and to continue preserving the biological materials for Dr. Haldar's malaria research until the motion for preliminary injunction can be resolved.  [*See id.*].  With these assurances, Dr. Haldar agreed that an emergency temporary restraining order is no longer necessary.  Accordingly, Haldar's instant motion will be denied to the extent it seeks an emergency temporary restraining order.  [DE 4].

### III.    MOTION FOR PRELIMINARY INJUNCTION

### A.    Legal Standard

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (quotations and citations omitted).  To obtain a preliminary injunction, a plaintiff must first make a threshold showing that there is (1) a likelihood of success on the merits, (2) irreparable harm if the preliminary injunction is denied, and (3) the inadequacy of any

remedy at law.  *Id.*  If a plaintiff makes this threshold showing, then "the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it."  *Id.*  (citation omitted).  In balancing the harms, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

### B.    Likelihood of Success on the Merits

Before a preliminary injunction order can issue, "the applicant must make a strong showing that she is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *see also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  The burden is significant but does not require the applicant to show that she will definitely win the case.  *Id.* at 763.  "A 'strong' showing thus does not mean proof by a preponderance[, which] would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending."  *Id.*  However, the applicant typically must demonstrate how she proposes to prove the key elements of its case.  *Id.* Dr. Haldar need only make a strong showing that she is likely to succeed on the merits of one of the seven claims raised in her Verified Complaint to meet her burden here.  *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008), *abrogated on other grounds by Nken*, 556 U.S. at 434.

### 1.    Section 1981, Title VII, and ADEA Discrimination Claims [Count I, VI, and VII)

#### a.    Causation

Section 1981 prohibits race discrimination in "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the

contractual relationship." *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 393 (7th Cir. 2007), *aff'd CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (discussing the legislative history of 42 U.S.C. § 1981(b) as amended by the Civil Rights Act of 1991). Section 1981 also applies to claims of retaliation. *CBOCS West, Inc.*, 553 U.S. at 457. Dr. Haldar raises both race discrimination and retaliation claims under Section 1981. To prevail, Dr. Haldar must show that she is "a member of a racial minority, that the defendants intentionally discriminated against her on the basis of her race, and that the discrimination related to the making or enforcing of a contract" to succeed on her Section 1981 claim. *Dochee v. Methodist Hosps., Inc.*, No. 2:21-CV-275-JEM, 2024 WL 4345774, at *2 (N.D. Ind. Sept. 30, 2024) (citing *Morris v. Off. Max*, 89 F.3d 411, 413 (7th Cir. 1996). In other words, Dr. Haldar "bears the burden of showing that race was a but-for cause of [her] injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020).

To show causation based on her race, Dr. Haldar relies heavily on alleged comments by Ms. Parseghian and allegations that Ms. Parseghian influenced Dean Schnell's decisions to impose restrictions in 2022 and 2024. Dr. Haldar alleges that Ms. Parseghian identified another person she wanted hired as the Director of the CRND when she was hired in 2008 and that he was a white male. [DE 1 at 7]. Yet she provides no evidence beyond her own testimony to confirm the statement or suggest that Ms. Parseghian wanted this individual in the position because he is white. And Ms. Parseghian stated in her affidavit that she "was thrilled" in 2008 to learn that Dr. Haldar was hired as Director of the CRND and that she made no personnel suggestions regarding the individual Dr. Haldar named. [DE 18-4 at 3]. On this record, Dr. Haldar has not made a strong showing as to Defendants' intent to discriminate against her based on her race, the critical element of any Section 1981 claim. Similarly, the record lacks any evidence that Dean Schnell or the University retaliated against Dr. Haldar for her 2022 faculty grievance by imposing the 2024 Restrictions, let alone any intent to discriminate on the basis of race in doing so.

13

Dr. Haldar's evidence of causation related to her ADEA age discrimination claim are not strong either. The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). Therefore, Dr. Haldar must prove that age was the "but-for" cause for the University's imposition of the 2022 and 2024 Restrictions to prevail on her ADEA claim. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Dr. Haldar does not allege "but-for" causation in her Verified Complaint. Instead, she alleges that her age was a "motivating factor" in the University's decision to remove her as Director of the CRND. [DE 1 at 27]. Her primary evidence for age discrimination is one comment by Dean Schnell in September 2021—before she was removed as Director of the CRND in May 2022—proposing a plan that a "'mid-career' associate professor" be hired and groomed to replace her as Director as evidence of intentional age discrimination. [*See id.* at 9]. When considered in light of Dean Schnell's affidavit stating he only spoke with Dr. Haldar "about the prospect of her recruiting an Associate Professor to train and mentor" without proposing that a "mid-career" faculty member be hired to replace her, Dr. Haldar's allegation of "but-for" causation is weakened.

### b.       Exhaustion of Administrative Remedies

Dr. Haldar clearly exhausted her administrative remedies as to her Title VII and ADEA discrimination claims arising from the 2022 Restrictions when she filed her EEOC Charge in July 2022. [DE 22-4]. She has timely filed those claims in this Court after receiving her right-to-sue letter on October 8, 2024. [DE 26]. However, allegations regarding the University's conduct after July 2022 is not included in the EEOC Charge and Dr. Haldar admits that she has not submitted a separate EEOC Charge for post-July 2022 conduct, including the 2024 Restrictions. "A plaintiff may pursue a claim not explicitly included in an EEOC complaint only if her allegations fall within

14

the scope of the earlier charges contained in the EEOC complaint" *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005) (quotation omitted).  New allegations fall within the scope of earlier charges if they are reasonably related to those in the earlier EEOC Charge and if so, whether the new claim "reasonably could have developed from the EEOC's investigation of the charges before it." *Id.*  "At a minimum, this means that the EEOC charge and the complaint must describe the same conduct and implicate the same individuals." *Id.* (citing *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2001).

As Dr. Haldar has accurately summarized in her instant briefing, her EEOC charge "alleged that Notre Dame discriminated against her based on her protected categories [of race, national origin, sex, and age] when Schnell imposed baseless restrictions on her laboratory that interfered with her work" up to and including July 18, 2022.  [DE 22 at 7 (citing DE 22-4)].  The subsequent conduct of Defendants at issue in Dr. Haldar's Verified Complaint, including the closing of her lab as part of the 2024 Restrictions, would likely be deemed similar conduct by the same individuals identified in the 2022 EEOC charge.  Therefore, for purposes of the preliminary injunction analysis, the Court will assume that Dr. Haldar's discrimination claims based on the University's post-charge conduct are reasonably related to her July 2022 charge and reasonably could have developed from the EEOC's investigation.

### c.    Evidence of Discrimination

Regardless of any issues with basic causation allegations or exhaustion of administrative remedies that may become clear as this case proceeds through discovery, the *McDonnell Douglas* burden-shifting method of proof applies to Dr. Haldar's Section 1981, ADEA, and Title VII claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 709 (7th Cir. 2015) (Section 1981, ADEA); *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (Title VII).  Under this method, Dr. Haldar bears the initial burden of establishing a prima facie case

of discrimination. *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005). To do so, she "must show that she: (1) is a member of a protected class, (2) is performing her job satisfactorily, (3) suffered an adverse employment action, and (4) was treated less favorably than at least one similarly-situated" employee not in her protected class. *Id.* Once a prima facie case is established, the burden of production shifts to Defendants to provide "a legitimate, nondiscriminatory reason" for the adverse employment decision. *Id.* If Defendants satisfy this burden, the burden returns to Dr. Haldar to show that Defendants' explanation was pretextual. *Id.*

Dr. Haldar has presented evidence that arguably satisfies the first three elements of for a prima face case on her discrimination claims. Dr. Haldar's ability to establish the final element of disparate treatment of similarly-situated employees outside her protected classes is disputed. For her prima facie showing of age discrimination, Dr. Haldar identifies as comparators Dean Schnell and the other tenured professor who became Co-Directors of the CRND when she was removed. Dean Schnell is identified as a white, Hispanic male and the other Co-Director is a white male; both are younger than Dr. Haldar. Dr. Haldar also provides evidence of the academic expertise of both men to show that they are less qualified than she is to run the CRND. Not surprisingly, Defendants have provided competing evidence of their qualifications to serve as Co-Directors of the Center.

Related to the race and gender discrimination claims, Dr. Haldar describes a comparator who is a white male faculty member in her department that has been the subject of complaints by personnel in his lab but has not been sanctioned as she has. Even at the hearing, however, Dr. Haldar could not identify this faculty member by name explaining that such information would be sought during discovery. Dr. Haldar's counsel did not object either when the University's counsel stated that she had asked opposing counsel whether any discovery was needed in preparation for the preliminary injunction hearing to which they responded "no." As such, Dr. Haldar has not presented evidence showing how she will prove the comparator element of her prima facie case.

Therefore, Dr. Haldar has not made a strong showing that she is likely to establish a prima facie case of discrimination because her showing regarding similarly-situated employees is so weak. Assuming she had, however, the University has made a strong showing that it has a legitimate non-discriminatory explanation for the 2022 and 2024 Restrictions imposed on Dr. Haldar. Dean Schnell's affidavit combined with the 2022 OIE report and the 2023 faculty grievance committee report suggest that the University's actions against Dr. Haldar were based on multiple complaints implicating the University's Respectful Environment Policy and Dr. Haldar's substandard performance as measured through funding—especially federal funding—and publications.

Dr. Haldar challenges the University's explanation as pretextual. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believed those reasons, pretext has not been shown." *Farrell*, 421 F.3d at 613 (internal citations omitted). "Pretext means a dishonest explanation, a lie rather than an oddity or an error." *Id.* Through her own affidavits, Dr. Haldar explains her work and the effects of the 2022 Restrictions on her productivity while also arguing that all the Restrictions imposed on her were based on false allegations regarding her conduct with donors and lab personnel. Yet the OIE investigation report and the faculty grievance committee report both corroborate Dean Schnell's rationales for the Restrictions as stated in the May 10, 2022, letter and the September 6, 2024, letter. These independent reports counter Dr. Haldar's allegations and weaken the testimonial evidence of Dr. Haldar related to pretext.

Therefore, Dr. Haldar has not made a strong showing that she is likely to succeed on the merits of her Section 1981, Title VII, or ADEA claims.

### 2.    Breach of Contract Claim (Count II)

Dr. Haldar alleges that the University breached its contracts with her by

impos[ing] restrictions on [her] lab that substantially and materially worsened the terms and conditions of her employment, including by reducing her salary . . . .

17

> inhibit[ing] her ability to perform her duties as a tenured professor [and impinging] on her rights as a tenured professor under the Faculty Contract . . . . [and closing] her lab in September 2024 without providing any of the process required by the Academic Articles.

[DE 1 at 22].  "To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012).  Dr. Haldar has not made a strong showing that she is likely to succeed on the merits of her breach of contract claim because the evidence she proposed to prove the element of breach is weak.

Dr. Haldar focuses on the imposition of "severe sanctions" under the Academic Articles. Under Academic Article IV/Section 9, "[t]he University may impose one or more severe sanctions on any faculty member for serious cause."  [DE 1-3 at 30].  Article IV/Section 9/Subsection (b) defines "Severe Sanction" as "dismissal from employment; suspension; revocation of tenure; demotion in academic rank; and reduction of individual salary of more than 2%."  [*Id.*].  "Serious cause" is defined in Article IV/Section 9/Subsection (a) as

> significant and deliberate academic dishonesty or plagiarism; misrepresentation of academic credentials; professional incompetence; continued neglect of academic duties, regulations, or responsibilities; conviction of a felony; significant and deliberate personal or professional misconduct (including, but not limited to, sexual harassment or discrimination in violation of University policies); continual significant disregard for the Catholic character of the University; or causing notorious and public scandal.

[*Id.*].

Dr. Haldar argues that when was removed as Director of the CRND in May 2022, her salary was reduced by 17%—more than the 2% "reduction of individual salary" deemed a "severe sanction" in the faculty section of the Academic Articles.  Yet Dr. Haldar's faculty salary was never reduced.  Rather, Dr. Haldar lost the administrative stipend she was paid as Director of the CRND. The plain language of the Academic Articles shows that faculty are governed by Article IV of the Academic Articles, while academic officers including directors of University centers, like the CRND,

are governed separately under Article III.  [*Compare* DE 18-3 at 24–30 (Article III), *with id.* at 31–67 (Article IV)].  Based on this language, Dr. Haldar has not made a strong showing that losing her Director's stipend qualifies as an Article IV "severe sanction."

Dr. Haldar also argues that closure of her lab, termination of her research program and ability to obtain grants, and termination of her ability to supervise students changes her responsibilities as a tenured professor and therefore constitutes the separate severe sanction of "demotion in academic rank."  She admits that she remains a tenured faculty member under Article IV/Section 1/Subsection (a)(1) with the same salary but contends that the change in her responsibilities is a wholesale change in her work amounting to a *de facto* demotion to the rank of Teaching Faculty under Subsection (a)(3).  No one disputes that Dr. Haldar's work responsibilities changed after imposition of the 2022 and 2024 Restrictions.  However, Dr. Haldar presents to evidence that she suffered a "demotion in her academic rank" under Article IV.

Having failed to show a likelihood that the restrictions imposed on her constituted a "severe sanction" under Article IV, Dr. Haldar has not made a strong showing that the University failed to follow the procedures in the Academic Articles related to imposition of severe sanctions.  With nothing more, Dr. Haldar has not demonstrated sufficient likelihood of success on her breach of contract claim to warrant a preliminary injunction.

### 3.    Breach of Good Faith And Fair Dealing Claim (Count III)

Whether the University and Dr. Haldar were obligated to each other under a covenant of good faith and fair dealing pursuant to her Faculty Contract and her contract appointing her as Director of the CRND is not as clear as both parties would have the Court believe.  "Indiana does not recognize an implied duty of good faith and fair dealing in *every* contractual setting . . . ."  *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 856 (7th Cir. 2017) (emphasis in original).  "In Indiana law, implied covenants of good faith and fair dealing apply only to insurance

and employment contracts or where contracts are ambiguous as to the application of the covenants or expressly impose them." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011) (citations omitted). An implied covenant of good faith also exists when one party "stands in a fiduciary, superior, or special relationship to the other." *Bowers v. Anthem, Inc.*, Case No. 1:19-cv-00802-TWP-DLP, 2019 WL 5965235, at * 5 (S.D. Ind. Nov. 13, 2019) (citations omitted).

Thus, the first question here becomes whether Dr. Haldar has presented evidence to show that her Faculty Contract and her directorship contract qualify as employment contracts under Indiana law. In Indiana, a valid and enforceable employment contract must contain "(1) the place of employment, (2) the period of employment, (3) the nature of the services the employee is to render, and (4) the compensation the employee is to receive." *Firestone v. Std. Mgmt. Corp.*, No. 1:04-CV-1223-DFH-TAB, 2005 WL 1606955, at *4 (S.D. Ind. July 5, 2005) (citing *Majd Pour v. Basic Am. Med., Inc.*, 512 N.E.2d 435, 439 (Ind. App. 1987)). Dr. Haldar's Faculty Contract meets these criteria as her "Faculty Contract for Professor" identifies her place of employment, her start date, her tenured position reflecting "permanence of contract" with termination "only for cause or discontinuance of an Academic Division," and her compensation. [DE 1-2 at 3]. The Faculty Contract also defines Dr. Haldar's nature of services as:

> full-time teaching, research, publication and public service in conformity with the policy of the University, and . . . such other collateral activities, including direction of students, administrative work and participation in Commencement Exercises and similar activities, as are usually associated with this position and as may be prescribed or agreed to by the said University.

[*Id.*]. And the Faculty Contract obligates the parties to "the provisions of the University of Notre Dame *Academic Articles* and any future amendments . . . ." [*Id.* (emphasis in original)].

Therefore, Dr. Haldar has made a strong showing that a duty of good faith and fair dealing will apply to her Faculty Contract. Next, she must make a strong showing that the University breached that duty. "A party violates the implied duty of good faith and fair dealing when, though

not breaching the *express* terms of the contract, he nonetheless behaves unreasonably or unfairly."

*Perron*, 845 F.3d at 856.   According to Dr. Haldar, the University behaved unreasonably and unfairly

by imposing the 2022 Restrictions on May 10, 2022, based on false complaints and without the

process afforded tenured professors under the Academic Articles.   Evidence of conduct before

October 11, 2022, however, is of no value because the statute of limitations for claims for breach of

good faith and fair dealing is two years.   *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct.

App. 2003) (citing Ind. Code § 34-11-2-4).

　　　Dr. Haldar's claim based upon her removal as Director of the CRND does not fare any

better.   To start, the most recent reappointment letter dated July 29, 2014, is not likely to qualify as a

valid and enforceable employment contract related to her directorship.   The reappointment letter

specifies a period of employment from July 1, 2014, through June 30, 2017, but that period has long

since expired.   [*See* DE 18-3 at 94].   And even before the official period of employment as Director

ended in 2017, Dr. Haldar's period of employment was not guaranteed as the reappointment letter

indicated that she was serving as Director "at the pleasure of the Dean of the College of Science."

[*Id.*].   The reappointment letter does not specify any compensation to Dr. Haldar either; it merely

discusses funding sources for the Center's work.   [*Id.*].   And nothing in the record suggests that

either Dr. Haldar or the University held any "fiduciary, superior, or special relationship to the

other."   *See Bowers v. Anthem, Inc.*, 2019 WL 5965235, at * 5.   As a result, Dr. Haldar has not made the

necessary showing that she was subject to an employment contract creating an implied covenant of

good faith and fair dealing claim based on her removal as Director of the CRND.   Even if she could,

her removal as Director occurred in May 2022, more than two years before this suit likely making

any claim related to the removal time-barred.   *See Del Vecchio*, 788 N.E.2d at 451.

### 4. Tortious Interference with Contract against Cindy Parseghian and Santiago Schnell (Counts IV and V)

Dr. Haldar alleges that Ms. Parseghian and Dean Schnell tortiously interfered in her contractual relationships with the University and her professional relationship with donors by making false allegations against her and imposing sanctions designed to make it impossible to perform her job. Indiana law recognizes that "intentional unjustified interference by third parties with an employment contract is an actionable tort." *Sheets v. Birky*, 54 N.E.3d 1064, 1072 (Ind. Ct. App. 2016) (citing *Drake v. Dickey*, 2 N.E.3d 30, 34 (Ind. Ct. App. 2013). "Tortious interference with a contractual relationship consists of the following elements: (1) the existence of a valid and enforceable contract; (2) the defendants' knowledge of the existence of the contract; (3) the defendants' intentional inducement of breach of the contract; (4) the absence of justification; and (5) resultant damages." *Id.* "[A] claim for tortious interference with an employment contract can [even] be maintained upon a contract terminable at will." *Drake*, 2 N.E.3d at 36.

"The Indiana statute of limitations for a tortious interference with contract claim is two years from the time the cause of action accrued, or when the plaintiff first knew of her injury resulting from a breach of the contract." *Dochee v. Methodist Hosps., Inc.*, No. 2:21-CV-275-JEM, 2024 WL 4345774, at *3 (N.D. Ind. Sept. 30, 2024) (citing Ind. Code § 34-11-2-4(a)).

Dr. Haldar's allegations against Cindy Parseghian all occurred between 2008 and 2019. [DE 1 at 8]. Moreover, both Dean Schnell and Ms. Parseghian averred in their affidavits that Ms. Parseghian was not involved in the imposition of sanctions on Dr. Haldar in 2022 and 2024. [DE 18-3 at 13; DE 18-4 at 3–4]. At the hearing, Dr. Haldar's counsel agreed that actions predating October 11, 2022 (two years before this case was initiated) probably could not serve as an independent basis for tortious interference claims. Alleging nothing against Ms. Parseghian after 2019, Dr. Haldar has not made the strong showing necessary to show that she is likely to succeed on the merits of the tortious interference claim against Ms. Parseghian. Similarly, the tortious

22

interference claim against Dean Schnell is probably time-barred to the extent that it is directed toward the 2022 Restrictions, which were imposed on May 10, 2022. *See Alexander v. CVS Pharmacy, Inc.*, No. 4:23-cv-00085-SEB-KMB, 2024 WL 83462, at *2 (S.D. Ind. Jan. 8, 2024).

To the extent that Dr. Haldar's tortious interference claim is directed to timely conduct by Dean Schnell, it faces an uphill climb to succeed because Dean Schnell imposed the 2024 Restrictions and interacted with Dr. Haldar both before and after imposing those restrictions in his capacity as Dean. The absence-of-justification element of a tortious interference claim is established by showing "that the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Haegert v. McMullan*, 953 N.E.2d 1223, 1234–35 (Ind. Ct. App. 2011) (quotation omitted). Consistent with this, "officers and directors of corporations are not personally liable for tortious interference with the corporation's contracts unless they acted outside the scope of their official duties in causing the breach." *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 138 (Ind. 2006). Dr. Haldar alleges that Dean Schnell made false allegations against her and decided to close her lab without legitimate justification. [DE 1 at 26]. Dr. Haldar suggests that Dean Schnell's conduct was motivated by discriminatory animus and was therefore outside the scope of his official duties. Yet Dr. Haldar has not made a strong showing of discriminatory animus, or any other illegitimate purpose, given the affirmation of Dean Schnell's 2022 Restrictions in 2023 by the faculty grievance committee [DE 25-2]; Dean Schnell's confirmation that he reviewed Dr. Haldar's September 16, 2024, letter explaining her disagreement with the 2024 Restrictions [DE 4-9]; and his encouragement for her to pursue the faculty grievance process regarding the 2024 Restrictions [DE 4-10]. With nothing more, Dr. Haldar has not demonstrated a likelihood of success on the merits of her tortious interference claim against Dean Schnell either.

Lacking a strong showing of likelihood of success on the merits from Dr. Haldar, the Court could end its analysis here. After all, "the threshold inquiry is whether [the plaintiff] proved that she was likely to prevail on the merits" of her claims. *Anderson v. U.S.F. Logistics (IMC), Inc.*, No. IP 00-1364-C T/G, 2001 WL 114270, at *8 (S.D. Ind. Jan. 30, 2001), *aff'd* 274 F.3d 470 (7th Cir. 2001) (denying preliminary injunction without analysis of irreparable harm or other elements because the plaintiff was unable to demonstrate reasonable[2] likelihood of success on the merits). Nevertheless, the Court will assess Dr. Haldar's harms absent the requested injunction.

### C.    Irreparable Harm

Among the relief Dr. Haldar requests in her Verified Complaint is a permanent injunction requiring Defendants to lift the restrictions placed on her laboratory since 2022. [DE 1 at 28]. Dr. Haldar now asks the Court to preliminarily enjoin the University from implementing or enforcing any of the sanctions set forth in Dean Schnell's letter dated September 6, 2024.[3] [DE 22 at 2]. Dr. Haldar argues that without a preliminary injunction, the Restrictions imposed on her, especially closing her lab, will end her career as a research scientist. She contends that closing the lab will mean the destruction of the biological materials used in her NKH, Kabuki, and malaria research and that regenerating those materials to restart the research would take years thereby slowing scientific progress of benefit to the public. She explains that the Restrictions have ended her access to donor funds designated for her research and hampered her ability to secure outside funding for her research making it impossible for her to relocate her research to another institution. With these

---

[2] This decision predates the "strong showing" standard for likelihood of success on the merits in *Nken*, 556 U.S. at 434 and *Winter*, 555 U.S. at 22.

[3] In the motion itself, Dr. Haldar asked for an injunction preventing the University from proceeding with both the 2022 and the 2024 Restrictions. [DE 4]. Through her briefing of the motion and her argument at the recent hearing, however, Dr. Haldar confirmed that she only seeks a return to the status quo before Dean Schnell issued his most recent round of sanctions on September 6, 2024, and only asks that the University be "prohibited from taking affirmative actions to limit her research and academic freedom." [DE 22 at 2].

harms in mind, Dr. Haldar argues that a preliminary injunction will allow her to continue her research while she applies for grants, especially NIH grants, until litigation in this case concludes.

To obtain a preliminary injunction, a plaintiff must show that she will suffer irreparable harm if an injunction is not issued. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020). Irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (quotations and citation omitted); *see also Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) (injury caused by irreparable harm "must be of a particular nature, so that compensation in money cannot atone for it."). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Monetary damages may be inadequate for one of four reasons: (1) if the plaintiff is at risk of shutting down its business or declaring bankruptcy, (2) the plaintiff may not be able to finance the lawsuit without the preliminary injunction, (3) the damages may be unobtainable from the defendant because the defendant may become insolvent before a final judgment can be entered and collected, or (4) monetary damages are difficult to calculate. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (citations omitted).

Dr. Haldar argues that no amount of money will compensate her for the loss of her life's work, loss of the biological materials, loss of the utility of the research already done, and loss of the last years of her career. Of these, only the loss of biological materials poses a close call as to whether it is irreparable harm to Dr. Haldar. Loss of utility of research and loss of last years of career can be compensated with money. Indeed lost utility and lost wages are calculated in courts all the time. Even the emotional toll associated with those losses and the loss of life's work can be compensated with money. *Cf., e.g.*, *Bagley v. Yale Univ.*, No. 3:13-cv-1890, 2014 WL 7370021, at *5–6, 10 (D. Conn. Dec. 29, 2014) (finding reputational harm and distress in academia speculative and

25

compensable by money damages at trial). Not even loss of reputation or inability to secure other employment is irreparable. *Cf., e.g.*, *EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980); *Brown v. Dist. of Columbia*, 888 F. Supp. 2d 28, 31–32 (D.D.C. 2012); *Halikas v. Univ. of Minn.*, 85 F. Supp. 1331 (D. Minn. 1994).

Destruction of Dr. Haldar's biological materials gives greater pause. In the end, however, the biological materials are only the means for Dr. Haldar to continue her career and her research and are replaceable. The University has also taken steps to mitigate Dr. Haldar's loss related to the biological materials by cryopreserving the malaria reagents, committing to cryopreserving the specially bred mice embryos and semen, and instructing the mice breeding team not to euthanize the mice without further authorization. According to Dr. Haldar, these efforts cannot preserve the mice meaningfully because the mice that emerge later will not be genetically the same preventing her from continuing her same line of research. She also explains that considerable time—on the order of up to 7 years—will be needed to breed and engineer the "new" mice to be ready for experimentation. The University and Dr. Haldar disagree as to how long the research will be delayed by these preservation efforts, but neither present evidence suggesting that the research could never be restarted. *Cf. Gately v. Com. of Mass.*, 2 F.3d 1221, 1221 (1st Cir. 1993) (finding irreparable harm to terminated employee approaching mandatory retirement age, which could pass during the pendency of litigation). While it may not be Dr. Haldar's preference, delay can be—and regularly is—compensated with money. As such, Dr. Haldar has not demonstrated that irreparable harm will ensue absent the requested injunction.

### D.    Balance of Harms

As already discussed, Dr. Haldar has neither made a strong showing of likelihood to succeed on the merits of any of her claims nor shown that she will suffer irreparable harm before her claims here are resolved and that any remedies available would be inadequate. As such, the Court could

just end the analysis and deny the requested injunction.  *See Girls Scouts*, 549 F.3d at 1086 ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction.").  While the Court need not proceed to the balancing of harms phase of the preliminary injunction analysis, the Court will do so in the interest of completeness.  *See Chi. Teachers Union v. DeVos*, 468 F. Supp. 3d 974, 991 (N.D. Ill. 2020)

The harms analysis requires that the Court balance the harm Defendants would suffer if preliminary relief were to be granted against Dr. Haldar's irreparable harm, with consideration given to the public interest of non-parties in granting or denying the requested injunction.  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  This "sliding scale approach" allows courts to mold the appropriate relief in a particular case using a subjective and intuitive approach.  *Id.* at 896.  Accordingly, the more likely the plaintiff will succeed on the merits, the less the balance of harms need favor the plaintiff's position and vice versa.  *Id.* at 895; *see also, e.g.*, *DeVos*, 468 F. Supp. 3d at 991 ("Because of the surpassingly low likelihood that CTU will succeed on the merits, CTU must make a compelling argument concerning the balance of harms.").

On the current record, Dr. Haldar has not made a strong showing that she will succeed on the merits of at least one of the seven claims in her Verified Complaint.  *See Pritzker*, 973 F.3d at 760; *see also Winter v. Nat. Res. Def. Council*, 555 U.S. at 22.  Additionally, the injunctive relief she seeks is not clearly irreparable as money could compensate her for the loss of her life's work, her research, and her remaining career.  Nevertheless, Dr. Haldar will suffer harm if her lab is closed as scheduled in December.  The full scope of her harm remains uncertain but would be affected by whether she could move her research to another institution, which would be dependent on her ability to secure funding, which would be largely dependent on whether she retained a lab and staff to effectuate the research proposed.

No harm has been articulated as to Defendants Schnell and Parseghian.  The harms to the University arise, in part, from the impingement of its rights to exercise its academic judgment and its rights as an employer to make employment decisions if injunctive relief were ordered.  First, courts are not "super personnel departments" charged with weighing the prudence of employment decisions.  *See O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001).  The University has decided that Dr. Haldar's conduct in her lab violated its Respectful Environment Policy and issued sanctions to show that such conduct is not acceptable.  [DE 18-3 at 5, 10, 14].  An injunction would interfere with this decision by the University based on its employment policies and signal to the University community that such conduct is acceptable creating risk of additional misconduct by others thereby putting the University's reputation at risk.  [*Id.* at 15].  The University also decided that Dr. Haldar's decreased research productivity did not satisfy her academic responsibilities and imposed sanctions as result.  An injunction reversing those restrictions would interfere with the University's academic judgments even though "courts have stressed the importance of avoiding second-guessing . . . legitimate academic judgments." *Univ. of Pa. v. EEOC*, 493 U.S. 182, 199 (1990).  Judges have also been cautioned "to show great respect for the faculty's professional judgment." *Id.*  More practically, keeping the lab open past December 12, 2024, and allowing Dr. Haldar's research to continue would cause the University to incur costs including staffing, equipment, and mice breeding.  And funding Dr. Haldar's lab would divert resources from promising work of other faculty despite stated issues with Dr. Haldar's ability to maintain a respectful workspace and meet her productivity obligations.  According to Dr. Haldar, these expenses would be minimal to the University because donor funds have already been designated for her research causing little to no harm for Defendants.

The public's interest in Dr. Haldar's research is supported by affidavits from Michael Ferguson and Mohandas Narla, scientists who both opine that Dr. Haldar's malaria research is

significant such that closing her lab would slow development of scientific knowledge. [DE 4-15; DE 22-3]. Dr. Haldar's Ph.D. student, Mr. Lopez, confirms by affidavit that "[t]here are only three other labs in the world that work on NKH [and none] have applied the same genetic tool to introduce a humanized mutation into those mice." [DE 16-1 at 4]. Yet the record shows that she is not the sole scientist working on these issues even if she uses a unique method. [DE 19 at 25 (citing websites describing the research of other scientists into malaria in Bangladesh, NKH, and Niemann Pick Type C ("NPC"))].

Mr. Lopez himself will be affected if the injunction is not issued as he and Dr. Haldar confirm through affidavits and argument at the recent hearing. Without the injunction, Mr. Lopez will be required to find a new advisor to complete his Ph.D. and may need to start a new line of research, which could delay his graduation and applications for post-doctoral positions by approximately 3 to 4 years. [DE 16-1 at 4]. This harm has already been mitigated to a degree, as confirmed at the hearing, because the University has taken steps to facilitate Mr. Lopez's graduation in 2025 through funding for a stipend and research equipment.

The balance of these harms weighs most heavily against the University who will be faced with financial and reputational costs if the injunction is issued. An injunction would also interfere with the University's rights to academic and business judgment harming its ability to fulfill its mission and values as a university. The harms to Dr. Haldar, the greater scientific community, and Mr. Lopez are real but have been, or can be, mitigated at least in part. Therefore, the balancing of harms favors denying Dr. Haldar's motion for preliminary injunction.

IV.    CONCLUSION

Dr. Haldar presents a difficult set of facts upon which this Court must decide whether a preliminary injunction is warranted. On the record before the Court, however, she has not met her burden to make a strong showing of likelihood of success on the merits on at least one of the seven

claims in her Verified Complaint or to establish that she will suffer irreparable harm absent an injunction. Even consideration of the balance of harms does not favor the preliminary injunctive relief she seeks.

Accordingly, Dr. Haldar's Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED**. [DE 4]. However, the University will—as it confirmed at the hearing on October 28, 2024—pay to cryopreserve the mice embryos and semen used in Dr. Haldar's NKH and Kabuki research and continue to preserve the biological materials for Dr. Haldar's malaria research until the motion for preliminary injunction is resolved in its entirety, including any appeal.

SO ORDERED.

November 5, 2024

  /s/ *Cristal C. Brisco*  
CRISTAL C. BRISCO, JUDGE  
UNITED STATES DISTRICT COURT