UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KASTURI HALDAR,

     Plaintiff,

     v.                                                        Case No. 3:24-CV-836-CCB-SJF

UNIVERSITY OF NOTRE DAME DU
LAC, et al.,

     Defendants.

## OPINION AND ORDER

Before the Court is Plaintiff Kasturi Haldar's ("Dr. Haldar's") Emergency Motion

for Reconsideration (ECF 36) of this Court's Opinion and Order dated November 5,

2024 (ECF 30), denying her motion for temporary restraining order and preliminary

injunction. Dr. Haldar only seeks reconsideration of the Court's decision to deny her

request for a preliminary injunction, not the temporary restraining order. Based on the

applicable law, facts, and arguments, Plaintiff's motion for reconsideration will be

granted in part while confirming the denial of the requested preliminary injunction.

## I.    RELEVANT BACKGROUND

The Court relies here upon the facts recited in detail in the first ten pages of its

November 2024 opinion. (*Id*. at 1–10). As relevant to the instant motion to reconsider,

Dr. Haldar is a member of the biological sciences faculty at Defendant University of

Notre Dame du Lac ("the University") and operated a research laboratory in the

University's Center for Rare and Neglected Diseases ("CRND") for which she served as

the Director for some time. Dr. Haldar initiated this lawsuit in response to restrictions the University imposed on her work in May 2022 by removing her as Director of the CRND and stopping her from hiring lab staff, advising graduate and postdoctoral students, supervising others in the lab, advising undergraduate students, and accessing 21 donor funds ("the 2022 Restrictions"). In November 2023, Dr. Haldar was also prohibited from accessing another source of funding, which she had used for breeding colonies of mice central to her research. In February 2024, Dr. Haldar was then prohibited from talking to donors. In April 2024, she was prohibited from attending a conference related to one of the diseases she was researching, Non-Ketotic Hyperglycinemia ("NKH")[1]. Further restrictions were imposed on Dr. Haldar on September 6, 2024, including the decommissioning of her lab effective December 12, 2024; ending all supervision of faculty, staff, scholars, and students; banning her from serving as principal investigator ("PI") or co-PI for any research project; and eliminating her access to all research funding sources.

The 2022 Restrictions were upheld by the University in 2023 in response to Dr. Haldar's faculty grievance, pursued consistent with procedures in the Academic Articles that govern faculty at the University. On October 10, 2024, Dr. Haldar submitted a second faculty grievance regarding the additional restrictions imposed on her. The next day, and while the second grievance was still pending, Dr. Haldar initiated this lawsuit by filing a verified complaint and her injunction motion. After a

---

[1] As described in the November 2024 opinion and order, Dr. Haldar conducted research in her CRND lab regarding NKH, Kabuki Syndrome, and malaria. (ECF 30 at 2).

hearing on October 28, 2024, this Court denied Dr. Haldar's request for a preliminary injunction finding that she had not made the necessary showings of likelihood of success on the merits and irreparable harm.

On November 18, 2024, Dr. Haldar filed the instant motion asking the Court to reconsider its denial of the preliminary injunction for two overarching reasons. First, Dr. Haldar argues that cryopreservation of the mouse colonies, rather than keeping them alive and in usable form, would render both her contractual right to pursue her ongoing faculty grievance and her right to appeal the Court's ruling meaningless. Second, Dr. Haldar asserts that the Court's denial of the requested preliminary injunction was based on mistakes of fact and law.

Briefing on Dr. Haldar's motion to reconsider was completed on April 8, 2025.[2] In their surreply, Defendants reported that the Faculty Grievance Panel completed its review of Dr. Haldar's second faculty grievance in January 2025 and provided both the Panel's report and the President's subsequent decision on the report to the Court. (*See* ECF 58 at 2; *see also* ECF 56-1 and 56-3). In her surrebuttal, Dr. Haldar admitted that her argument related to her right to faculty grievance committee review has been mooted by the Panel's and the President's actions. (ECF 73 at 1–2).

The Court turns first to the alleged mistakes of law and fact that Dr. Haldar contends led to an improper denial of the preliminary injunction then addresses her

---

[2] On March 26, 2025, the Court granted Defendants leave to file a surreply. (ECF 63). In the same order, Dr. Haldar was granted leave to file a surrebuttal to Defendants' sur-reply. (*Id.*).

argument that cryopreservation of the mouse colonies would render her right to appeal meaningless.

## II.   ANALYSIS

Dr. Haldar invokes Fed. R. Civ. P. 59 in seeking reconsideration of the November 2024 injunction order. Rule 59 governs motions for new trials and motions to alter or amend a judgment. No trial has been held in this case. No judgment has been entered either. Therefore, Dr. Haldar's motion for reconsideration falls outside the scope of Rule 59. Dr. Haldar's motion more properly falls within the scope of Fed. R. Civ. P. 54(b), which embodies the inherent power of courts to revise non-final orders as justice requires before entry of final judgment. *Cf. e.g.*, *Shure, Inc. v. ClearOne, Inc.*, No. 17 C 3078, 2019 WL 4014230, at *2 (N.D. Ill. Aug. 25, 2019); *First Specialty Ins. v. Supreme Corp.*, No. 3:12-CV-186 JD, 2018 WL 4680015, at *1 (N.D. Ind. Sept. 28, 2018).

Motions for reconsideration are disfavored but can serve limited valuable functions to correct manifest errors of law or fact; consider newly discovered evidence; or address errors of apprehension. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990); *see also* *Publishers Res., Inc. v. Walker-Davis Publ'ns, Inc.* 762 F.2d 557, 561 (7th Cir. 1985) (quotation omitted). "A manifest error is not demonstrated by the disappointment of the losing party." *Oto v. Metro. Life Ins.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotation omitted). "It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Id.* (internal quotation omitted). As such, motions for reconsideration are not to be used to advance arguments that the Court has addressed and decided. *See* *Caisse Nationale de Credit Agricole v. CBI*

*Indus., Inc.,* 90 F.3d 1264, 1270 (7th Cir. 1996). "Indeed, the court's orders are not mere first drafts, subject to revision and reconsideration at a litigant's pleasure." *Lock Realty Corp. IX v. U.S. Health, LP*, No. 3:06-CV-487RM, 2010 WL 148296, at *1 (N.D. Ind. Jan. 13, 2010). "The opportunity to present a motion to reconsider should not be viewed as a second opportunity for the losing party to make its strongest case or to dress up arguments that previously failed." *Indiana v. Helman*, No. 1:08CR48-TS, 2008 WL 2557246, at *1 (N.D. Ind. June 23, 2008) (internal quotation omitted).

### A.    Preliminary Injunction

As stated in the Court's injunction opinion, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (ECF 30 at 11 (citing *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999) (quotations and citations omitted)). To obtain a preliminary injunction, a plaintiff must first make a threshold showing that there is (1) a likelihood of success on the merits, (2) irreparable harm if the preliminary injunction is denied, and (3) inadequacy of any remedy at law. *Cooper*, 196 F.3d at 813. If a plaintiff makes this threshold showing, then "the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.* In balancing the harms, "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Id.* (citing *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country*

*Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013) (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

### 1.    Likelihood of Success on the Merits

Before a preliminary injunction order can issue, "the applicant must make a strong showing that she is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020 (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)). A strong showing is less than a preponderance of the evidence but requires the applicant to demonstrate how she proposes to prove the key elements of her case. *Pritzker*, 973 F.3d at 763.

In denying Dr. Haldar's requested injunction, the Court found that Dr. Haldar had not made a strong showing of success on the merits of any of her claims. (ECF 30 at 24). Dr. Haldar challenges the Court's finding on grounds that (1) the incorrect statute of limitations was applied to her breach of the covenant of good faith and fair dealing claim; (2) the restrictions imposed on her in 2023 and 2024 were not addressed in the analysis of her good faith and fair dealing claim; and (3) mistakes of fact were made in assessing her discrimination claim.

### a.    Breach of Covenant of Good Faith and Fair Dealing

In the November opinion, the Court confirmed that Indiana law recognizes an implied covenant of good faith and fair dealing in a narrow range of contractual settings, including employment contracts. (ECF 30 at 20–21 (citing *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011))). After showing that Dr. Haldar's faculty contract documents, submitted as exhibits to the parties' briefing, met the

requirements of a valid and enforceable employment contract, the Court concluded that Dr. Haldar "made a strong showing that a duty of good faith and fair dealing will apply to her Faculty Contract." (ECF 30 at 20). With that conclusion, the Court considered whether Dr. Haldar had made a strong showing that the University breached that duty. (*Id*. at 20–21). The Court did not analyze the breach of covenant of good faith and fair dealing claim against the University because it found that the claim was untimely after applying a two-year statute of limitations. (*Id*. at 21). Dr. Haldar now argues that the Court applied the incorrect statute of limitations to her good faith and fair dealing claim and failed to consider the claim as it related to actions alleged after May 10, 2022, when the 2022 Restrictions were imposed, including allegations of arbitrary and bad faith actions in 2023 and 2024.

As Dr. Haldar correctly notes in briefing the instant motion to reconsider, the statute of limitations question as it relates to the good faith and fair dealing claim was raised for the first time in Defendants' brief in response to the original injunction motion through a footnote. In the body of that brief, Defendants presented a one-sentence argument related to the good faith and fair dealing claim asserting that the State of Indiana recognizes no such claim. (ECF 19 at 12). At the end of that sentence, Defendants dropped the following footnote:

> Even if an independent cause of action could stand, the tort has a two-year statute of limitations and thus would not apply to the alleged breach in May 2022. *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct. App. 2003).

(*Id.*). Defendants developed nothing in the body of their response brief related to the statute of limitations applicable to Dr. Haldar's good faith and fair dealing claim. Yet Dr. Haldar did not mention the good faith and fair dealing statute of limitations in her reply brief either.

As a result, the Court solicited more information from the parties regarding potential statute of limitations issues at the October hearing. Before allowing counsel to present oral argument, the Court stated: "[B]ecause the allegations in the verified complaint include conduct that is more than two years old, I would like to know if that presents any statute of limitations problems for the plaintiff." (ECF 36-4 at 6). As Dr. Haldar acknowledged in her own footnote in her reply brief in support of the instant motion to reconsider, "[t]he only discussion of statutes of limitations at oral argument between the Court and either party was about the appropriate statute of limitations for Plaintiff's tortious interference claims." (ECF 50 at 7 n.3; *see also* ECF 36-4 at 14, 49–50). Thus, the record before the Court on the appropriate statute of limitations for Dr. Haldar's good faith and fair dealing claim was limited to Defendants' footnote citing *Del Vecchio v. Conseco, Inc.* in support of a two-year statute of limitations.

For the first time, Dr. Haldar now argues that Defendants waived any argument that a two-year statute of limitations applies by only raising it in a footnote in the underlying briefing. Indeed, courts have held that arguments raised only in footnotes are forfeited or waived. *Moriarty ex rel. Local Union No. 727, I.B.T. Pension Trust, and the Teamsters Local No. 727 Health and Welfare Trust v. Svec,* 429 F.3d 710, 722 (7th Cir.2005); *United States v. White,* 879 F.2d 1509, 1513 (7th Cir. 1989); *Greer v. Advanced Equities, Inc.,*

683 F. Supp. 2d 761, 766 (N.D. Ill. 2010); *Vulcan Golf, LLC v. Google Inc.*, 552 F. Supp. 2d 752, 765 (N.D. Ill. 2008); *E.E.O.C. v. Custom Companies, Inc.*, Nos. 02 C 3768, 03 C 2293, 2007 WL 1810495, at *4 (N.D. Ill. June 21, 2007); *Mechanics Laundry & Supply, Inc. of Indiana S'holders Liquidating Tr. v. Am. Cas. Co. of Reading, PA*, No. 1:04CV1122 DFHTAB, 2007 WL 1021452, at *5 (S.D. Ind. Mar. 30, 2007). But Dr. Haldar also waived any challenge to Defendants' statute of limitations footnote because she did not raise her waiver argument in her underlying reply brief or at the injunction hearing. *See Helman*, 2008 WL 2557246, at *1; *cf. Wolotka v. Sch. Town of Munster*, 399 F. Supp. 2d 885, 901 (N.D. Ind. 2005) ("It is well settled law in this Circuit that arguments raised for the first time in a reply brief are waived."). She did not address the statute of limitations applicable to her good faith and fair dealing claim at all before filing the instant motion for reconsideration.

Now, Dr. Haldar challenges the Court's finding that the *Del Vecchio* two-year statute of limitations applies. She acknowledges that this is the first time she has discussed the issue but argues, without citing any authority, that she is entitled to do so because the Court considered the appropriate statute of limitations in the November opinion even though Defendants did not raise it properly. She contends that her good faith and fair dealing claim sounds in contract rather than tort such that the ten-year statute of limitations for written contract claims authorized by Ind. Code § 34-11-2-11 applies. None of the authority she now cites in support, including some nonbinding cases from other jurisdictions she references in a footnote, was part of the underlying record on the injunction motion. (*See* ECF 36 at 9).

On this record, the Court is persuaded that Defendants forfeited their statute of limitations argument in their underlying response brief below by presenting it in a footnote and failing to develop the argument fully. *See Moriarty ex rel. Local Union No. 727, I.B.T. Pension Trust, and the Teamsters Local No. 727 Health and Welfare Trust*, 429 F.3d at 722; *White*, 879 F.2d at 1513. Thus, the question of what statute of limitations applies to Dr. Haldar's good faith and fair dealing was not properly raised by either party and need not be decided on reconsideration. However, the full range of restrictions imposed on Dr. Haldar should be considered in assessing her good faith and fair dealing claim for purposes of the injunction motion.

To succeed on the good faith and fair dealing claim, Dr. Haldar must show that the University violated its implied duty of good faith and fair dealing by behaving "unreasonably and unfairly" even if it did not breach the express terms of the contract. *See Perron ex rel. Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 856 (7th Cir. 2017). Dr. Haldar's original memorandum in support of a preliminary injunction cited limited facts relevant to the key elements of the good faith and fair dealing claim. (ECF 5 at 14–15). Using conclusory statements, she referenced "justified expectations" under her Faculty Contract and argued that the University's actions toward her were "arbitrary, capricious, and undertaken in bad faith" leading to sanctions "imposed based on false complaints and without any process by which Dr. Haldar could be heard." (*Id.* at 14). She provided no factual basis for the conclusions but did cite to her appointment letter dated April 8, 2008 (ECF 1-2), and Article IV of the University's Academic Articles, which outlines the rights and obligations of the faculty (ECF 1-3).

In her underlying reply brief, however, Dr. Haldar identified some specific evidence in support of the good faith and fair dealing claim. (ECF 22 at 5–7). She cited to:

(1) her cover letter to the Faculty Grievance Committee dated December 20, 2022, which delineated her grievance related to the 2022 Restrictions only (ECF 4-3 at 7–8);

(2) her supplemental affidavit describing her April 2023 meeting with the investigator responsible for the 2022 Investigation Report from the University's Office of Institutional Equity ("OIE") (ECF 22-1 at 20, ¶ 102); her interactions with immigrant lab members between 2019 and 2021 (*Id.* at 18–19, ¶¶ 91-95, 98–100); and her understanding of the funding request process prescribed by the 2022 Restrictions and the results of her funding requests in 2023 and 2024 (*Id.* at 22–23, ¶¶ 109–114);

(3) an email exchange with the OIE investigator summarizing their April 2023 meeting regarding the OIE investigation (ECF 22-5);

(4) an affidavit from her graduate student, Alejandro Lopez Ramirez, testifying about the environment in her lab to support her argument that any issue that may have existed in 2021–2022 was resolved (ECF 22-2 at 2, ¶ 5);

(5) Defendant Santiago Schnell's testimony in his Declaration about alleged threats to immigrants working in Dr. Haldar's lab (ECF 18-3 at 8, ¶ 29; 15, ¶ 62); and the 2022 Restrictions reflected in his May 10, 2022, letter to Dr. Haldar (*Id.* at 11, ¶ 40);

(6) the OIE Investigation Report dated February 3, 2022 (DE 18-3 at 101, 103);

(7) the May 10, 2022, letter imposing the 2022 Restrictions (ECF 4-2); and

(8) two emails in November and December 2023 between Defendant Schnell's Director of Strategic Initiatives, Allison Slabaugh, and Dr. Haldar regarding payment of an invoice for research mice development (ECF 22-7).

While Dr. Haldar's briefing of the good faith and fair dealing claim only incorporated evidence connected to the 2022 Restrictions, her attorney highlighted evidence beyond the 2022 Restrictions at the hearing. Dr. Haldar's counsel emphasized what she called a "laundry list" of examples of the University's bad faith in dealing with Dr. Haldar. (ECF 36-4 at 19–21). She asserted that Defendant Schnell wanted Dr. Haldar out of leadership from the time he was appointed Dean in 2021. Counsel stated that the OIE investigation was initiated based on Dr. Haldar's 2021 conduct, but she was never informed of the specific allegations against her or given the OIE findings, which prevented her from successfully changing her behavior. Counsel then focused on the September 6, 2024, restrictions, especially the closing of Dr. Haldar's lab, as an example of the University's bad faith. According to counsel, allegations in the September 2024 restrictions about Dr. Haldar's application for a SAM.gov government contractor account and her interaction with a former colleague about an article arising from their joint research were false. Additionally, counsel construed the September 2024 restrictions to be a result of the University's "gamesmanship" suggesting that the 2022 Restrictions set Dr. Haldar up for failure by making it impossible for her to get the grants necessary to meet the University's research productivity requirements.

In response, defense counsel acknowledged disagreement among the parties as to many issues that potentially culminated in the September 2024 restrictions, including

the nature of Dean Schnell's interactions with Dr. Haldar, the reasons for the OIE investigation, Dr. Haldar's communications with donors in 2024, Dr. Haldar's conduct related to the SAM.gov account, her collegiality with former colleagues, and her professional productivity. Defense counsel also highlighted the University's allegedly good faith efforts to address what it perceived to be escalating complaints about Dr. Haldar's conduct starting as least as far back as 2021. As counsel noted, the record shows that (1) Dean Schnell discussed complaints about Dr. Haldar's lab environment with her in 2021 and offered suggestions for improvement, which she allegedly rejected; (2) the OIE investigation in 2022 was based on multiple interviews that told a consistent story about the lab environment; and (3) the Faculty Grievance Panel responded to Dr. Haldar's complaint about the 2022 Restrictions with an independent review consistent with the process provided for in the Academic Articles.

On that record alone, the Court can now assess whether Dr. Haldar made a strong showing that the University behaved unreasonably and unfairly even if it did not breach the express terms of Dr. Haldar's Faculty Contract. *See Perron ex rel. Jackson*, 845 F.3d at 856. To start, the record is very clear that the parties disagree vehemently on many of the factual underpinnings of this claim. For instance, disputes of fact exist as to the conclusions reached by Defendants about Dr. Haldar's conduct in managing and interacting with those working in her lab, in communicating with donors, in interacting with colleagues, and in meeting research productivity goals. Dr. Haldar also ascribes nefarious intent to Defendants in their consideration of her, her work, and her role at the University. Moreover, Dr. Haldar rejects the conclusions in the OIE Report alleging

they built a faulty foundation for the sanctions imposed against her in 2022, which was the basis for all subsequent sanctions. All of these facts are relevant to Dr. Haldar's good faith and fair dealing claim. Yet the facts Dr. Haldar cites as evidence of the University's gamesmanship and dishonesty, even if true, are insufficient on their own to make the strong showing of unreasonable and unfair behavior by the University necessary to justify a preliminary injunction. *See Perron ex rel. Jackson*, 845 F.3d at 856.

Dr. Haldar paints a picture of a years-long effort to remove her from not just her role at the CRND but also from the University as a whole. In support, she relies heavily on her own affidavits and her December 2022 grievance letter interpreting her interactions with Dean Schnell, the OIE investigator, and other University leaders. She essentially suggests that she has been sabotaged through the University's processes but without presenting any corroborating evidence besides the short affidavit of her graduate student stating that his experience in her lab was excellent and any problems that led to the 2022 sanctions were resolved. The other documentation she presents to the Court, including the 2022 and 2024 sanction letters, the OIE report, the first Faculty Grievance Report, emails regarding funding requests, and an email with the OIE investigator, tell a different story.

Dr. Haldar's affidavits and her grievance letter represent her view that excessive sanctions were imposed on her based on incorrect and incomplete information. But even Dr. Haldar's own statements show that the University followed a process to enforce its policies and values when confronted with complaints about her conduct. Dr. Haldar's lab was not decommissioned immediately upon complaints in 2021. In 2021,

14

Dean Schnell discussed the complaints with her and recommended ways to improve. Both Dr. Haldar's conduct and Dean Schnell's interactions with her were assessed as part of the OIE investigation in 2022. The 2022 Faculty Grievance Panel reviewed and commented upon the OIE Investigation Report. The University President independently reviewed and affirmed the Faculty Grievance Panel's recommendations. Nothing in this record suggested that the Faculty Grievance Panel reviewing Dr. Haldar's second faculty grievance in October 2024 would not follow the same procedures.[3] Additionally, Dr. Haldar was able to present questions and evidence about the complaints against her with Dean Schnell, the OIE investigator, and the Faculty Grievance Panel even if those exchanges were not satisfactory to her.

Despite the parties' differing interpretations of the facts involved, Dr. Haldar's evidence of alleged bad faith by the University does not support a finding that the University acted unreasonably and unfairly in its approach to Dr. Haldar. The University informed her of its concerns, provided suggestions for improvement, and only escalated to sanctions when complaints continued to surface. Even if the Court or a jury eventually finds that the University misinterpreted the underlying facts about Dr. Haldar's behavior, the record as it stood after the October 2024 injunction hearing demonstrates a strong likelihood that the University acted reasonably and fairly in response to Dr. Haldar's workplace conduct. Therefore, Dr. Haldar has not made a

---

[3] While the results of Dr. Haldar's second faculty grievance are not relevant to this analysis, it cannot be ignored that the Faculty Grievance Panel independently investigated the allegations raised by Dr. Haldar and the University President independently reviewed their work. (*See* ECF 56-1 and 56-3).

strong showing that she is likely to succeed on the merits of her good faith and fair dealing claim.

### b.    Discrimination

In its November 2024 opinion, the Court considered the likelihood of Dr. Haldar's success on the merits of her race and gender discrimination claims. (ECF 30 at 16–17). The Court found that Dr. Haldar had not made a strong showing of the likelihood to succeed because she had not presented evidence of how she would prove that she was treated less favorably than at least one similar-situated employee, the final element of a prima facie case of discrimination. (*See id.* at 16 (citing *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005)). In the opinion, the Court stated that "[e]ven at the hearing, . . . Dr. Haldar could not identify [the comparator faculty member] by name explaining that such information would be sought during discovery." (*Id.*). As Dr. Haldar explains in her motion for reconsideration, the hearing transcript shows that the Court did not ask Dr. Haldar to disclose the alleged comparator's name during oral argument, and Dr. Haldar did not represent to the Court that she required discovery to identify the comparator professor. (*See* ECF 36-4 at 22, 58). The hearing transcript also shows that Dr. Haldar's counsel had yet to disclose the alleged comparator's name to Defendants' counsel; that Dr. Haldar's counsel had not asked for any discovery related to the comparator analysis in advance of the preliminary injunction hearing; and that when counsel had a discussion about whether Dr. Haldar needed discovery before the injunction hearing, Defendants' counsel was informed that the answer to that question was "no." (*Id.* at 52).

"Similarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Dr. Haldar contends that a white, male professor in her academic department, who operates a lab and is overseen by Dean Schnell like she is, had complaints of an abusive management style in the lab made against him, but his lab was not closed. Her contentions suggest key commonalities between herself and the alleged comparator. *See Carouthers v. County of Cook*, 808 F.3d 1140, 1150 (7th Cir. 2015) (explaining that when assessing whether "sufficient commonalities on the key variables" exist between a plaintiff and a comparator, courts generally consider whether they shared a supervisor, were subject to the same standards, and engaged in similar conduct). But the "similarly-situated" analysis requires a "flexible, common-sense examination of all relevant factors" to ensure that each comparator is "sufficiently comparable to the plaintiff to suggest that the plaintiff was singled out for worse treatment." *Id.* (citing *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007); *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (internal quotations omitted)).

Even assuming Dr. Haldar and her colleague both share the same supervisor, were subject to the same standards, and were the subject of complaints about their lab environments, other facts beyond the record available to the Court are relevant to the determination of whether Dr. Haldar was "singled out for worse treatment" than the alleged comparator. *See Coleman*, 667 F.3d at 846 (quoting *Crawford*, 461 F.3d at 846). As Defendants suggested in their underlying response brief, the volume of complaints

against them could be different; the alleged comparator could have responded differently to the complaints against him than Dr. Haldar responded to the complaints against her; and the University could have responded to the complaints against the alleged comparator differently than it responded to the complaints against Dr. Haldar. (ECF 19 at 15–16).

Dr. Haldar acknowledged as much in her underlying reply brief when she stated that "information about complaints against other Notre Dame professors and any actions Notre Dame took in response are solely in Defendants' possession" and that she would only gain access to that relevant information through discovery. (ECF 22 at 9–10). She confirmed at the hearing that she has not alleged what kind of response the University took to the complaints against the alleged comparator or how many complaints were raised against him noting that "it will take discovery to know what the defendants did, whether they did anything about it." (ECF 36-4 at 22). With that said, Dr. Haldar did not dispute defense counsel's statement at the hearing that the University had offered her the opportunity for discovery related to the requested preliminary injunction and she rejected that offer. (ECF 36-4 at 22, 52).

Having rejected the discovery that the University offered, Dr. Haldar did not demonstrate how she proposes to prove the "similarly-situated" element of the prima facie case of discrimination. *See Pritzker*, 973 F.3d at 763; *see also Farrell*, 421 F.3d at 613. Without that discovery, Dr. Haldar did not show that the alleged comparator is "directly comparable to [her] in all material respects." *See Coleman*, 667 F.3d at 846. Therefore, Dr. Haldar did not meet her burden to make a strong showing that she is

likely to establish a prima facie case of discrimination, or otherwise succeed on the merits of her discrimination claims. *See Pritzker*, 973 F.3d at 762. The outcome of the Court's analysis of the evidence Dr. Haldar presented regarding the alleged comparator faculty member in support of the injunction motion does not change.

### 2. Irreparable Harm

In its November 2024 opinion, this Court found that Dr. Haldar had not shown that she would suffer irreparable harm before her claims are resolved or that any of the remedies available for her claims would be inadequate. (ECF 30 at 26). The Court's finding stemmed from its conclusions that "the loss of [Dr. Haldar's] life's work, . . . the loss of the utility of the research already done, and loss of the last years of her career" could be compensated with money. (*Id*. at 25). The Court further determined that destruction of Dr. Haldar's biological materials, including the mouse colonies, was not irreparable harm because there was no evidence that the research could not be restarted even after destruction of the biological materials. (*Id*. at 26).

The Court conducted the harms analysis and reached these conclusions even though Dr. Haldar had not met her threshold burden to make a strong showing of likelihood to succeed on at least one of her claims. (*See id*. at 24 (citing *Anderson v. U.S.F. Logistics (IMC), Inc.*, No, IP 00-1364-C T/G, 2001 WL 114270, at *8 (S.D. Ind. Jan. 30, 2001), *aff'd*, 274 F.3d 470 (7th Cir. 2001)). Similarly, the Court proceeded to the balancing of harms phase of the preliminary injunction analysis even though Dr. Haldar had not met her burden to show that she would suffer irreparable harm before her claims could

be resolved and that any remedies available would be inadequate. (ECF 30 at 26–27

(citing *Chi. Teachers Union v. DeVos*, 468 F. Supp. 3d 974, 991 (N.D. Ill. 2020))).

Dr. Haldar still has not made a strong showing of likelihood of success on the

merits of any of her claims. Therefore, an irreparable harm analysis remains

unnecessary. *See Anderson*, 2001 WL 114270, at *8. To be consistent with the November

2024 opinion, however, the Court will address Dr. Haldar's current request to

reconsider parts of the irreparable harm analysis in that opinion, including the

balancing of harms analysis to the extent consistent with her arguments.

In challenging the Court's irreparable harm findings, Dr. Haldar contends that

the Court's findings were dependent on mistakes of fact and law. Dr. Haldar points to

the concluding statement of the opinion about the University's agreement to

cryopreserve the mouse colonies. Dr. Haldar argues that the Court misunderstood the

effect of cryopreservation on the mouse colonies themselves and consequently on her

research. Thus, she asserts that irreparable harm exists and that a preliminary injunction

should be entered.

### a.    Preliminary Issue

Before turning to Dr. Haldar's specific irreparable harm arguments, a

preliminary matter must be addressed. The parties misinterpret the concluding

statement to the Court's November 2024 opinion as an order requiring the University to

cryogenically preserve Dr. Haldar's mouse colonies. (ECF 30 at 30). The Court's final

paragraph reads:

> Accordingly, Dr. Haldar's Motion for Temporary Restraining Order and Preliminary Injunction is **DENIED**. . . . However, the University will—as it confirmed at the hearing on October 28, 2024—pay to cryopreserve the mice embryos and semen used in Dr. Haldar's NKH and Kabuki research and continue to preserve the biological materials for Dr. Haldar's malaria research until the motion for preliminary injunction is resolved in its entirety, including any appeal.

(*Id*.). The plain language of the last sentence does not order the University to do anything. It simply reflects facts and promises made on the record without exerting any external control over the University's cryopreservation efforts. The other two references in the opinion to the University's commitment to cryopreservation do the same.

First, the University's agreement to cryopreserve the mouse colonies was referenced in the Court's discussion of the temporary restraining order ("TRO") requested by Dr. Haldar. (*Id*. at 11). The Court concluded that Dr. Haldar's request for a TRO could be denied based on the parties' agreement, stated at the hearing, that more than 14 days had passed since she filed her motion for a TRO and preliminary injunction such that only the preliminary injunction standard would govern analysis of the motion. (*Id*.; *see also* ECF 36-4 at 4–5). Beyond that, the opinion noted that the University had confirmed at the hearing that it agreed to pay to cryopreserve the mice embryos and semen and to continue preserving the biological materials for malaria research. (ECF 30 at 11). This was consistent with emails on record from defense counsel to Dr. Haldar's counsel on October 18, 2024, indicating that

> to resolve the TRO motion, [Defendants] are prepared to:
>
> • Pay to cryopreserve the mice embryos or semen until the PI is decided; [and]

    • Continue to preserve the biological materials for the malaria research
until the PI is decided.

(ECF 18-2 at 5). Even assuming that Dr. Haldar's thinking about the need for a TRO was

affected by the University's assurance of cryopreservation during the pendency of the

preliminary injunction motion, the Court's TRO decision was based on the timing of

events, not any directive to the University to comply with its cryopreservation promise.

    Second, the University's promise to cryopreserve the mouse colonies was noted

in the section of the Court's opinion analyzing the irreparable harm element relevant to

the preliminary injunction request. (ECF 30 at 26). The Court found that destruction of

the biological materials, including the mouse colonies, would pose the greatest risk of

irreparable harm to Dr. Haldar. The opinion acknowledged the University's steps to

mitigate Dr. Haldar's loss, including its commitment to cryopreservation of the mice

embryos and semen as well as instruction to the mice breeding team not to euthanize

the mice without further authorization as factual context regarding the delay in research

Dr. Haldar would face without a preliminary injunction. The Court's conclusion that

delaying Dr. Haldar's research did not constitute irreparable harm was based on Dr.

Haldar's failure to show that her research could never be restarted regardless of any

delay in her research and that any delay was compensable, not on the University's

cryopreservation efforts. As such this reference to the University's cryopreservation

efforts was not a Court order either.

    No other reference to the University's cryopreservation efforts was made in the

Analysis section of the Court's opinion. Thus, nothing in the opinion even hints that the

Court's decision to deny Dr. Haldar's preliminary injunction motion depended on the University's cryopreservation efforts. To order any change in the University's conduct related to Dr. Haldar's biological materials while denying the preliminary injunction Dr. Haldar sought to impose on the University would have negated the Court's decision altogether. As a result, the Court's third and final reference to the University's cryopreservation efforts in the last sentence of the Conclusion section of the opinion, after the formal denial of Dr. Haldar's preliminary injunction motion, is not an order directing the University's conduct. It is simply a restatement and clarification of the University's commitment to mitigate Dr. Haldar's loss. Even still, Dr. Haldar asks the Court to reconsider the concluding cryopreservation statement.

### b.    Epigenetic Changes

Dr. Haldar asserts that the loss from cryopreservation of the mouse colonies will be far more significant than the Court's opinion suggests. Dr. Haldar contends that the Court's reliance on the University's cryopreservation efforts to mitigate loss reflects a misunderstanding of the effects of cryopreservation on the mouse colonies. Dr. Haldar directs the Court's attention to the following statement in its opinion:

> According to Dr. Haldar, [cryopreservation] cannot preserve the mice meaningfully because the mice that emerge later will not be **genetically** the same preventing her from continuing her same line of research.

(ECF 30 at 26) (emphasis added).

As Dr. Haldar explained at the October 2024 hearing and again in her briefing here, cryopreservation changes the mice **epigenetically**, not genetically. (*See* ECF 36-4 at 8, 26, 59; ECF 36 at 5–6). The Court does not dispute the scientific distinction Dr. Haldar

makes between epigenetic and genetic change. Review of the entirety of the opinion, however, reveals that the Court's use of "genetically" is simply a typographical error and not a manifest error of fact with any determinative effect. In fact, this very sentence confirms that the Court understood and considered Dr. Haldar's concern that cryopreserving the mouse colonies would end her current line of research. As a result, any reconsideration of this issue would merely be an improper rehashing of facts and arguments already made and considered. *See Caisse Nationale de Credit Agricole*, 90 F.3d at 1270.

### c.    Loss of Research

Dr. Haldar also disagrees with the Court's conclusion that any loss caused by cryopreservation of the mouse colonies could be compensated financially. As the Court noted in the November opinion, monetary remedies may be inadequate to address a litigant's harm in several situations, including "if the plaintiff is at risk of shutting down its business or declaring bankruptcy [or] monetary damages are difficult to calculate." (ECF 30 at 25 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984))).

According to Dr. Haldar, cryopreservation of the mouse colonies would result in the termination of her entire research program. She analogizes this loss to shutting down a business and contends that this is sufficient to establish irreparable harm contrary to the Court's conclusion. Dr. Haldar has consistently argued that her harm exceeds loss of employment, however, she raised neither the "shutting down a business" theory nor the five supporting cases she now cites in her motion for

reconsideration in her original briefing or at the hearing. (*See* ECF 36 at 13–14 (citing *Semmes Motors, Inc. v. Ford Motor Col*, 429 F.2d 1197, 1205 (2d Cir. 1970); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1095 (7th Cir. 2008), *abrogated on other grounds by Nken*, 556 U.S. at 434; *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003); *Bar Indy LLC v. City of Indianapolis*, 508 F. Supp. 3d 334, 360 (S.D. Ind. 2020); *Goldhaber v. Foley*, 519 F. Supp. 466, 475 (E.D. Pa. 1981)). Those cases were all decided by 2020, long before this matter arose and were therefore available to Dr. Haldar when she first filed the injunction motion in October 2024.

After making her "shutting down a business" argument in her motion for reconsideration, Dr. Haldar adds a two-sentence paragraph that starts with "[t]his is also a case where monetary damages would be difficult, if not impossible, to calculate." (ECF 36 at 14). In support she cites *Roland*, which the Court cited in the November opinion to show that "[m]onetary damages may be inadequate for one of four reasons [including] monetary damages are difficult to calculate." (ECF 30 at 25). Before her second sentence, she cites two cases that she did not rely on in litigating the underlying injunction motion to emphasize that it is difficult or impracticable to calculate monetary damages for "loss of institutional knowledge," "damage to goodwill," and "loss of business relationship." (ECF 36 at 14 (quoting *Girl Scouts of Manitou Council*, 549 F.3d at 1095; *Foodcomm*, 328 F.3d at 304 in explanatory parentheticals)). She ends the paragraph with the following assertion: "Simply put, there is no ready way to calculate a monetary value for lost scientific progress, knowledge, and the development of therapies that could cure rare diseases." (ECF 36 at 14).

Dr. Haldar's intent with this add-on assertion is not clear. It seems as if Dr. Haldar is trying to connect the assertion to her argument that her loss of research constitutes irreparable harm to her. But the assertion also reflects potential harms more generally to the scientific community than specific to Dr. Haldar. Either way, the Court already addressed these arguments in the November opinion. The Court discussed the adequacy of monetary damages to compensate Dr. Haldar for "the loss of her life's work, loss of the biological materials, loss of the utility of the research already done, and loss of the last years of her career." (ECF 30 at 25–26). The Court also considered the public's interest in Dr. Haldar's research by weighing affidavits from non-party scientists about the effect of her work in the scientific community against efforts of other scientists working on the same issues. (*Id*. at 28–29).

With nothing more, Dr. Haldar has merely reprised the same argument without establishing any manifest error of law or fact worthy of reconsideration. *See Caisse Nationale de Credit Agricole*, 90 F.3d at 1270; *Lock Realty Corp. IX*, 2010 WL 148296, at *1; *Helman*, 2008 WL 2557246, at *1.

### d.    Harm to Dr. Haldar's Graduate Student

In analyzing the public interest of non-parties in a preliminary injunction as part of the balancing of harms analysis, the Court found that Dr. Haldar's graduate student, Mr. Lopez Ramirez, would be affected if the preliminary injunction were not granted. (ECF 30 at 29). The Court noted that "[t]his harm has already been mitigated to a degree, as confirmed at the hearing, because the University has taken steps to facilitate Mr. Lopez Ramirez's graduation in 2025 through funding for a stipend and research

equipment." (*Id*.). Dr. Haldar raises her concerns about Mr. Lopez Ramirez's future again in her motion for reconsideration. She argues that the Court's finding that his harm has been mitigated to a degree is contrary to the record. (ECF 36 at 15). Dr. Haldar then explains the effect of cryopreservation of the mouse colonies on Mr. Lopez Ramirez's research, graduation, and career. She also delineates developments between the University and Mr. Lopez Ramirez regarding his research and graduation since the November opinion was issued to show that the University has not "taken steps  to make sure he finishes his PhD by 2025" as it represented to the Court at the preliminary injunction hearing. (ECF 36-4 at 54).

The Court declines to consider Dr. Haldar's renewed arguments regarding the harm to Mr. Lopez Ramirez because she repeats arguments already considered. *See Caisse Nationale de Credit Agricole*, 90 F.3d at 1270; *Lock Realty Corp. IX*, 2010 WL 148296, at *1; *Helman*, 2008 WL 2557246, at *1. Additionally, the University's efforts to mitigate harm to Mr. Lopez Ramirez since the November opinion was issued do not establish any mistake of law or fact that would warrant reconsideration of the opinion.

### B.    Right to Appeal

Lastly, Dr. Haldar asserts that the University's cryopreservation efforts do not sufficiently mitigate the assorted harms arising from the denial of the preliminary injunction making any appeal of the Court's injunction decision illusory. Dr. Haldar reiterates that cryopreservation of the mouse colonies would end her research definitively and immediately rather than maintain the status quo leaving her unable to continue her research even if her appeal ultimately led to entry of the requested

preliminary injunction. Dr. Haldar explains that cryopreservation would have a similar permanent effect on Mr. Lopez Ramirez regardless of the outcome of any appeal.

No one disputes that denial of the preliminary injunction harms Dr. Haldar, Mr. Lopez Ramirez, the scientific community, and the public, at least in part. While Defendants have not addressed Dr. Haldar's "illusory appeal" argument, Dr. Haldar has presented no authority that requires the Court to ensure mitigation of all harms pending appeal. Such a requirement would be illogical as it would nullify any denial of a preliminary injunction.

Moreover, Dr. Haldar had control over any risk of an illusory appeal. Dr. Haldar could have immediately appealed the November 2024 preliminary injunction opinion. *See* 28 U.S.C. § 1292(a)(1) (establishing appellate jurisdiction for interlocutory orders on injunctions by district courts). She did not. And nothing she has presented here shows that the November opinion or the University's commitment to cryopreservation of her biological materials limited her right to appeal the denial of her preliminary injunction motion. Thus, Dr. Haldar's illusory appeal argument does not support a finding of irreparable harm or otherwise support reconsideration of the denial of her requested preliminary injunction.

## III.    CONCLUSION

For the reasons discussed above, Dr. Haldar's Motion for Reconsideration is **GRANTED IN PART** to correct a typographical error and to ensure a complete analysis of the likelihood of Dr. Haldar's success on the merits of her breach of the covenant of good faith and fair dealing claim. (ECF 36). Despite these modifications to the Court's

November 2024 Opinion and Order (ECF 30), Dr. Haldar still has not met her burden to make a strong showing of likelihood of success on the merits of at least one of the seven claims in her Verified Complaint or to establish that any irreparable harm will be suffered absent an injunction or that any of the remedies available for her claims would be inadequate. Therefore, no preliminary injunction will enter.

SO ORDERED on May 8, 2025

   /s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT