UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KASTURI HALDAR, | |
| Plaintiff, | |
| v. | Case No. 3:24-CV-836-CCB-SJF |
| UNIVERSITY OF NOTRE DAME DU LAC, et al., | |
| Defendants. | |

## OPINION AND ORDER

Before the Court is Defendants University of Notre Dame Du Lac, Santiago

Schnell, and Cindy Parseghian's Motion to Partially Dismiss the Complaint. (ECF 39).

Based on the applicable law, facts, and arguments, Defendants' motion will be granted

in part.

I.    RELEVANT BACKGROUND

This case arises from events involving Plaintiff Kasturi Haldar's ("Dr. Haldar's")

employment at Defendant University of Notre Dame ("the University"). The following

facts are alleged in Dr. Haldar's Verified Complaint (ECF 1) and the documents

attached to her Complaint or referred to in her Complaint. Dr. Haldar's allegations are

accepted as true for purposes of deciding the pending motion to dismiss.

Dr. Haldar is a 67-year-old Asian woman of Indian national origin and a tenured

professor in the Department of Biological Sciences, College of Science, at the University.

(ECF 1 at 3, 4). Dr. Haldar began her service at the University in August 2008. (*Id.* at 4). Dr. Haldar's hiring is memorialized in an Offer Letter dated March 20, 2008 (ECF 1-1), and an Appointment Letter dated April 8, 2008 (ECF 1-2). Dr. Haldar accepted the terms of the Offer Letter defining her nine-month base salary as a tenured professor, appointing her to an endowed professorship, detailing plans to develop a lab for her research, and noting the Dean's intent to name her as the first Director of the College's Center for Rare and Neglected Diseases ("CRND"). (ECF 1-1). The Appointment Letter is more concise but identified the same nine-month base salary and endowed professorship while incorporating by reference the University's Academic Articles. (ECF 1-2). The Appointment Letter and the Academic Articles together constitute Dr. Haldar's Faculty Contract. (*Id.*).

In a reappointment letter dated July 29, 2014, Dr. Haldar was renewed as CRND Director from July 1, 2014, through June 30, 2017. (ECF 1-4 at 2). The reappointment letter stated that she would be "serving at the pleasure of the Dean of the College of Science." (*Id.*). No subsequent reappointment letter was issued, but Dr. Haldar continued to serve as the CRND Director after 2017. (ECF 1 at 7).

Dr. Haldar alleges that Defendant Cindy Parseghian, president of the Parseghian Foundation and an influential member of the University's Board of Trustees, did not want her appointed as CRND Director in 2008. (*Id.*). Instead, Ms. Parseghian wanted the first CRND Director to be a white male professor of chemistry at the University. (*Id.*). In 2014, after the CRND was officially renamed the Boler-Parseghian Center for Rare and

Neglected Diseases in honor of contributions of the Boler and Parseghian Foundations, the Dean at that time asked Dr. Haldar to invite the same white male professor to be the deputy director of the CRND. (*Id*.). The professor declined the invitation, but Dr. Haldar believes the Dean pursued the invitation to appease Ms. Parseghian. (*Id*.). In 2019, Ms. Parseghian denied Dr. Haldar entry to a conference where she accused Dr. Haldar of stealing the white male professor's scientific results. (*Id*. at 8). Dr. Haldar also understood a separate 2019 comment from Ms. Parseghian—that Ms. Parseghian did not like Dr. Haldar because she "did not represent 'her' (Parseghian's) Notre Dame"— as a reference to her race, ethnicity, and national origin. (*Id*.).

Dr. Haldar's work as a tenured professor and in the CRND included running a laboratory researching Non-Ketotic Hyperglycinemia ("NKH"), Kabuki Syndrome, and malaria. Dr. Haldar and her staff bred and genetically engineered mouse colonies and developed reagents to be used in research experiments related to those diseases. (*Id*. at 16, 19–20). Dr. Haldar's lab staff included faculty, research assistants, undergraduate students, and graduate students. (*Id*. at 10–14).

In August 2021, while Dr. Haldar was serving as CRND Director, Defendant Santiago Schnell was appointed Dean of the College of Science. (*Id*. at 8). On September 29, 2021, Dean Schnell met with Dr. Haldar and proposed a plan for Dr. Haldar to "groom" a "new 'mid-career' associate professor . . . to take over as CRND director once they had been promoted to full professor." (*Id*. at 9). Dean Schnell told Dr. Haldar that he was "just following orders" with this plan for Dr. Haldar to step down as

Director. (*Id*.). Dr. Haldar believed that Dean Schnell's plan was ordered by Ms. Parseghian or a University administrator effectuating Ms. Parseghian's desire to remove Dr. Haldar from the Directorship. (*Id*.). Dr. Haldar reluctantly agreed to Dean Schnell's plan expecting that the transition to a new director would take place in 2023 and that she would play an important role in the transition. (*Id*.).

In November 2021, Dean Schnell informed Dr. Haldar of complaints from a postdoctoral fellow in her lab who complained that Dr. Haldar did not provide mentorship or support and discouraged vacations. (*Id*.). In a subsequent letter, Dean Schnell instructed Dr. Haldar that she "should impose written policies for 'regular working hours and vacation'" for her lab personnel, "provide consistent mentoring to laboratory personnel[,] and treat research team members with 'respect and compassion.'" (*Id*. at 10). Dr. Haldar did not understand the reason for Dean Schnell's instructions because she allowed scheduling flexibility for her lab staff, including students, and provided regular feedback on their work. (*Id*.). Dr. Haldar attempted to meet with Dean Schnell and the associate provost to discuss the directives, but he never met with or explained the directives despite assurances he would. (*Id*. at 11).

A subsequent investigation of complaints from Dr. Haldar's lab was conducted by the University's Office of Institutional Equity ("OIE") and concluded in February 2022. (*Id*.). The OIE investigator informed Dr. Haldar about the investigation, which was initiated based on the fellow's complaints. (*Id*.). The OIE investigator described allegations from others, including that Dr. Haldar had yelled at a meeting, did not grant

time-off requests, and did not provide feedback to lab personnel as desired. (*Id.*). Dr.
Haldar declined an interview with the investigator but responded in writing providing
documentation relevant to the complaints. (*Id.* at 12; ECF 40-1 at 2).

On May 10, 2022, Dean Schnell sent a letter to Dr. Haldar terminating her
appointment as CRND Director and imposing restrictions related to her lab, her
supervision of staff and students, and her ability to advise graduate and undergraduate
student research for three years ("the 2022 Restrictions"). (ECF 1 at 12–13). The May
2022 letter warned Dr. Haldar that additional restrictions could be imposed if her
behavior continued consistent with previous complaints. (*Id.* at 13; ECF 40-1 at 4–5).
These restrictions prevented Dr. Haldar from applying for grants because she could not
hire employees to conduct any grant work and from moving her lab to another
university. (ECF 1 at 13). Losing her position as CRND Director also meant she lost the
three-months of supplemental salary she had been allowed to take each summer from
CRND endowments. (*Id.*). Dean Schnell and another tenured professor and department
chair from the College replaced Dr. Haldar as joint directors of the CRND. (*Id.*). Both are
white men who are younger than Dr. Haldar. (*Id.*).

On July 18, 2022, Dr. Haldar filed a complaint with the Equal Employment
Opportunity Commission ("EEOC") alleging that the University's actions up to
imposition of the 2022 Restrictions constituted discrimination based on race, national
origin, gender, and age. (*Id.* at 4). On October 8, 2024, the EEOC issued Dr. Haldar a
right to sue letter. (*Id.*).

Dr. Haldar submitted a faculty grievance related to the 2022 Restrictions consistent with procedures in the Academic Articles. (*Id*. at 14). At the end of March 2023, the faculty grievance committee recommended leaving the 2022 Restrictions on Dr. Haldar's research operations in place but also recognized some shortcomings in the credibility of some complaints against her and in Dean Schnell's handling of the complaints against, and restrictions imposed on, Dr. Haldar. (*Id*. at 15; ECF 25-2 at 7).

Dr. Haldar continued her research in her lab after the 2022 Restrictions were imposed. Dean Schnell approved Dr. Haldar's use of funds donated for the study of rare diseases, which she used until November 2023 when authority to use the funds was rescinded because of allegations that she had been inappropriately using the funds for rare disease research. (ECF 1 at 15). Some of the funds had been donated by families of people affected by NKH and designated for breeding a specialized colony of mice for Dr. Haldar's experiments. (*Id*. at 15–16). By November 2023, the mice were ready to be bred further to become suitable for Dr. Haldar's research, but Dean Schnell's office refused to provide funds to keep the mice alive. (*Id*. at 16). The University did not alert the donors to the funding withdrawal. (*Id*.).

In February 2024, the donors asked Dr. Haldar for an update on her research. (*Id*.). Dr. Haldar asked two University employees to join her in a meeting to provide the update, but they did not participate. (*Id*.). Dr. Haldar informed the donors that NKH research had stopped in November 2023 and that the mouse colonies were in a precarious situation without funding to maintain them. (*Id*.). The upset donors raised

their concerns with University administrators. (*Id*. at 17). On February 28, 2024, the Provost banned Dr. Haldar from communicating with donors and from attending a rare disease research conference. (*Id*.). Dr. Haldar did not speak to donors after that, even though donors continued to seek research updates from her. (*Id*.).

On September 6, 2024, Dean Schnell sent Dr. Haldar a letter imposing new restrictions ("the 2024 Restrictions") on her and her research. (*Id*. at 18). The 2022 Restrictions were made permanent and expanded to prohibit supervision of students and service as principal investigator or co-principal investigator on any new grants or contracts. (*Id*.). The September 2024 Restrictions announced the closure of Dr. Haldar's lab by December 12, 2024; revocation of funding associated with her endowed professorship; and elimination of all research funding by December 12, 2024. (*Id*) According to Dean Schnell's letter, these restrictions were imposed because Dr. Haldar "harassed" donors and patients in February 2024; attempted to obtain control of a University government account; asked to review a former colleague's abstract before deciding whether to allow her name to be added as an author; and failed to obtain NIH grants. (*Id*. at 17–18). Then on September 11, 2024, Dr. Haldar was removed as an advisor on her Ph.D. student's thesis committee and was informed that her teaching load would be increased effective Spring 2025. (*Id*. at 18).

On September 16, 2024, Dr. Haldar sent Dean Schnell a letter as prescribed by the Academic Articles asking to attempt informal resolution of the concerns he raised in his letter to her while providing information disputing the underlying allegations. (*Id*.).

Dean Schnell responded stating, without explanation, that he had a "very different view" of the facts and that he would not reconsider his decision to close her lab. (*Id.*). In response, Dr. Haldar asked for a conversation to understand Dean Schnell's perspective and his view of the information she provided, which he refused to do. (*Id.* at 18–19). He also invited her to file a faculty grievance if she disagreed with his decision. (*Id.* at 19). On October 10, 2024, Dr. Haldar submitted her faculty grievance regarding Dean Schnell's decision to close her lab. (*Id.*).

Based on these facts, Dr. Haldar filed her Verified Complaint in this Court on October 11, 2024. Dr. Haldar raises claims against all three Defendants for race discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count I); against the University for breach of her Faculty Contract (Count II); against the University for breach of good faith and fair dealing (Count III); against Ms. Parseghian for tortious interference with contract (Count IV); against Dean Schnell for tortious interference with contract (Count V); against the University for discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* (Count VI); and against the University for discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count VII). Dr. Haldar describes the effects of Defendants' actions as a "substantial and dramatic change to the terms and conditions of her employment, limit [on] her academic freedom, and breach of her Contracts." (ECF 1 at 20). Dr. Haldar alleges damages in the form of lost wages, injury to her professional reputation and career opportunities, and emotional distress. (*Id.*).

Dr. Haldar also filed a motion for temporary restraining order and preliminary injunction with her complaint. That motion was denied. (ECF 30, 84). Defendants now move to dismiss all but the Section 1981 discrimination claims against the University and Dean Schnell (Count I, in part) and the Title VII discrimination claim against the University (Count VI).

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)); *accord McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2013) (a complaint "must contain 'allegations plausibly suggesting (not merely consistent with)' an entitlement to relief"). A complaint therefore fails to state a claim if it does not "describe the claim in sufficient detail to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests [or] plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *E.E.O.C. v. Concentra Health Servs.*, Inc., 496 F.3d 773, 776 (7th Cir. 2007) (internal quotations omitted). "Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must 'ask itself could these things have happened, not did they happen.'" *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 833 (7th Cir. 2015).

In considering a motion under Fed. R. Civ. P. 12(b)(6), a court must accept as true all facts alleged in the complaint, consider the information included in exhibits attached

to the complaint, and draw all reasonable inferences in favor of the plaintiff. *Bogie v. Rosenberg*, 705 F.3d 603, 608–09 (7th Cir. 2013). Documents attached to a 12(b)(6) motion to dismiss may be considered without converting the motion into a motion for summary judgment if the documents are referred to in the complaint and are central to the claim raised in the complaint, or if the documents contain information that is subject to proper judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). This is a narrow exception to Fed. R. Civ. P. 12(d) and is appropriate, for example, in cases interpreting a contract. *Levenstein*, 164 F.3d at 347. Here, Defendants attached to their motion to dismiss Dean Schnell's May 10, 2022, letter to Dr. Haldar presenting the 2022 Restrictions (ECF 40-1), and the full text of the Academic Articles (ECF 40-2). Both documents are referred to in Dr. Haldar's Complaint and are central to at least one, if not all, the claims in the Complaint including her breach of contract claim against the University. Additionally, Dr. Haldar poses no objection to consideration of these documents, as shown by her reliance on them both in her response brief. Therefore, these documents will be considered without converting the instant motion to dismiss into a motion for summary judgment.

Dr. Haldar also attached five exhibits to her response brief, including assorted emails (ECF 53-1 through 53-4) and the University Bylaws (ECF 53-5). She argues that the Court can consider the documents because they are consistent with allegations in her Complaint. In her response brief, Dr. Haldar also cites to documents submitted to

the Court as part of her motion for temporary restraining order and preliminary injunction ("the PI Documents"), including her own affidavits (ECF 4-13, ECF 22-1), the February 2022 OIE Investigation Report (ECF 25-1), her December 2022 Faculty Grievance (ECF 4-3), the March 2023 Grievance Committee Report (ECF 25-2), a February 2024 Letter to her from the Associate Provost (ECF 4-6), and the transcript of the October 2024 preliminary injunction hearing before this Court (ECF 34). Defendants do not challenge Dr. Haldar's reference to the PI Documents but do assert, in a footnote, that the exhibits attached to her brief should not be considered because she established no evidentiary foundation for the documents through sworn affidavits.

"A plaintiff opposing a Rule 12(b)(6) motion to dismiss may submit evidence to illustrate allegations without turning that motion into a Rule 56(a) motion for summary judgment." *Kuebler v. Vectren Corp.*, 13 F. 4th 631, 636 (7th Cir. 2021) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (noting that a party opposing a Rule 12(b)(6) motion to dismiss in a district court may "submit materials outside the pleadings to illustrate the facts the party expects to be able to prove."). "Such documents . . . provide a way for a plaintiff to show a court that there is likely to be some evidentiary weight behind the pleadings the court must evaluate." *Roe v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1007 (S.D. Ind. 2007). A party "opposing a Rule 12(b)(6) motion [is also] free to 'elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 n.2 (7th Cir. 2021) (quoting *Geinosky*, 675 F.3d at 745 n.1). The opposing

party "may describe the evidence she expects to offer to support factual allegations, and nothing prevents [the party] from including such allegations in the complaint or from tendering affidavits or other documents to show that those expectations about evidence are realistic." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 480 (7th Cir. 2020).

Courts have handled a variety of documents and supplemental allegations filed by parties in response to Rule 12(b)(6) motions. In *Kuebler*, the court found that consideration of a financial expert's affidavit, attached to the amended complaint and relied upon in the plaintiffs' opposition to the motion to dismiss, was proper for purposes of the Rule 12(b)(6) analysis. 13 F.4th at 636. In *Geinosky*, the appellate court discussed the role of additional materials in deciding a Rule 12(b)(6) motion as part of its explanation for citing a newspaper article in its opinion. 675 F.3d at 745 n.1. In *Peterson*, the court considered the plaintiff's supplemental allegations submitted in opposition to a Rule 12(b)(6) motion without converting the motion into a motion for summary judgment. 986 F.3d at 753. The *Bridgestone* court explicitly considered "a number of additional documents that plaintiffs [] submitted, including the United States Department of State Overview to Country Reports on Human Rights Practices for 1997" in its Rule 12(b)(6) analysis that the plaintiffs supported with an affidavit from their attorney. 492 F. Supp. 2d at 1007. And the *Bell* court affirmed consideration of affidavits of linguists who opined on the language on a relevant food label at issue in a motion to dismiss. 982 F.3d at 480. These courts did not, however, require plaintiffs to submit sworn affidavits to establish an evidentiary foundation as Defendants suggest here.

12

Dr. Haldar's response brief describes evidence she expects will support the factual allegations in her Complaint and has tendered affidavits and documents, some of which have already been used as evidence, to show that her expectations are realistic. *See id.* The five exhibits attached to her response illustrate facts she expects to prove in support of the claims in her Complaint. *See Geinosky*, 675 F.3d at 745 n.1. Additionally, Dr. Haldar references the PI Documents to elaborate on allegations in her Complaint. *See Peterson*, 986 F.3d at 753 n.2. These materials are outside the pleadings but show that there is likely to be some evidentiary weight for the allegations in Dr. Haldar's Complaint. *See Bridgestone*, 492 F. Supp. 2d at 1007.

Therefore, the documents attached to and cited by Dr. Haldar in her response to Defendants' motion to dismiss will be considered as part of the Rule 12(b)(6) analysis[1] without converting the motion to dismiss to a motion for summary judgment.

### A.    Count II: Breach of Contract against the University

Through Count II, Dr. Haldar alleges that the University breached her Faculty Contract when Dean Schnell imposed the 2022 Restrictions, which "substantially and materially worsened the terms and conditions of her employment, including reducing her salary." (ECF 1 at 22). Dr. Haldar alleges that the 2022 Restrictions "inhibited [her]

---

[1] The Court already analyzed Dr. Haldar's claims by applying the preliminary injunction standard in deciding her motion for temporary restraining order and preliminary injunction. (ECF 30, 84). To prevail on her motion for temporary restraining order and preliminary injunction, Dr. Haldar had to make a "strong showing" that she is "likely to succeed on the merits" of her claims. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The Court's conclusions in the TRO-PI Order are not dispositive of whether Dr. Haldar's Complaint states a plausible claim for relief. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

ability to perform her duties as a tenured professor and thus impinge on her rights as a tenured professor under the Faculty Contract." (*Id.*). Dr. Haldar further alleges that the University breached the Faculty Contract by imposing the "severe sanctions without the process guaranteed in Article IV/Section 9 of the Academic Articles." (*Id.*). Dr. Haldar also alleges that the University breached her Faculty Contract "when Dean Schnell closed her lab in September 2024 without providing any of the process required by the Academic Articles." (*Id.*). In response to Defendants' motion to dismiss, Dr. Haldar also posits that the University breached her contract by violating the academic freedom and lab space guarantees in her Faculty Contract and the Academic Articles.

"To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). No party disputes that Dr. Haldar has alleged a contractual relationship with the University arising from her Faculty Contract, including the Academic Articles. The issue is whether Dr. Haldar has alleged a breach of that contract.

Defendants argue that the breach of contract claim should be dismissed with prejudice because Dr. Haldar cannot demonstrate that the University breached any contractual obligations to her. Indeed, Dr. Haldar could "plead herself out of court by alleging facts that show she has no legal claim." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). Defendants contend that the 2022 and 2024 Restrictions do not include any "severe sanctions" as that term is defined in the Academic Articles. As a

result, Defendants argue that the University did not breach the contract even though they did not adhere to process requirements outlined in the Academic Articles before imposing the restrictions. Defendants also contend that Dr. Haldar's academic freedom and lab space arguments lack merit because Dr. Haldar did not comply with obligations in her contract to comport with University policies in her research and her conduct toward faculty, staff, and students.

Under Article IV/Section 9 of the Academic Articles, the University may impose a "severe sanction" on a faculty member for serious cause, as explicitly defined, but only if specified procedures are followed. Severe sanctions are defined as "dismissal from employment; suspension; revocation of tenure; demotion in academic rank; and reduction in individual salary of more than 2% . . . ." (ECF 40-2 at 42). Dr. Haldar argues that her removal as CRND Director resulted in reduction in her individual salary of more than 2% and that the restrictions on her lab operations, supervision responsibilities, and research funding have resulted in a de facto demotion in rank.

On its face, the Complaint alleges that the University imposed the severe sanction of salary reduction on Dr. Haldar without the process guaranteed by the Academic Articles. Defendants state that Dr. Haldar's faculty salary, governed by Article IV of the Academic Articles, was never reduced even though the compensation she received for her service as CRND Director ended when she was removed from that position. According to Defendants, Dr. Haldar's compensation for her work as CRND Director supplemented her faculty salary but was not covered by Article IV. Her

appointment as CRND Director was an academic officer or administrator appointment governed by Article III. Dr. Haldar disagrees with Defendants' interpretation of Article IV/Section 9 arguing that the plain language of Section 9(b) defines the severe sanction of salary reduction in terms of "individual salary," not "faculty salary," a term used later in Section 13 of Article IV. She adds that Article III/Section 8 addresses academic officers or administrators without discussing their salaries. She even challenges whether Article III applies to the CRND Directorship because the CRND is a College center, not a University center, and Article III/Section 8 only refers to University centers.

Whether Dr. Haldar's reduction in overall compensation as the result of her removal as CRND Director constitutes a severe sanction as she alleges in Count II requires interpretation of the meaning of the Academic Articles. Contract interpretation is a matter of law with the goal of "determin[ing] the intent of the parties at the time that they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012). The plain language of the contract determines its meaning unless the contract's language is found ambiguous. *Id.*; *see also Wohlt v. Wohlt*, 245 N.E.3d 611, 616 *(Ind. 2024)*; *U.S. Automatic Sprinkler Corp. v. Erie Ins. Exch.*, 204 N.E.3d 215, 223 (Ind. 2023). If the contract language is deemed ambiguous, a factfinder must decide the facts from which the agreement's meaning can be construed. *Wohlt*, 245 N.E.3d at 616. Here, Dr. Haldar's allegations in Count II allege a plausible breach of contract claim, absent a conclusion that her reduction in compensation could never be a severe sanction under the Academic Articles. The parties' conflicting interpretations of the Academic Articles

16

reflect reasonable arguments that require analysis of whether the language of the relevant Academic Articles is ambiguous on this point.

The same is true for Dr. Haldar's allegations that the 2022 and 2024 Restrictions imposed a separate severe sanction in the form of a de facto demotion in rank. Dr. Haldar does not explicitly allege a demotion in rank. Rather, she alleges that the restrictions "worsened the terms and conditions of her employment" and "inhibited [her] ability to perform her duties as a tenured professor [impinging] on her rights as a tenured professor under the Faculty Contract." (ECF 1 at 22). She does not dispute that she remains a tenured professor even after the restrictions. But she argues that the restrictions "gutt[ed] her job and convert[ed] it into one that most closely resembles a different academic rank." (ECF 54 at 10). In support, Dr. Haldar compares the description of her work responsibilities in the 2008 Offer Letter and the Academic Articles to the nature of her work responsibilities after the restrictions were imposed. She argues that these changes are improper unilateral modifications of the terms of her contract that violate substantive promises in her contract.

Defendants again turn to the Academic Articles, where the categories and ranks of faculty are defined, as proof that Dr. Haldar did not suffer a demotion in rank because she undisputedly remains a tenured professor. (*See* ECF 1-3 at 2, 6–7). Defendants also distinguish cases cited by Dr. Haldar for the proposition that a contract can be breached when substantive terms are violated even if the contract is technically followed. (*See* ECF 54 at 10 (citing *Cook Inc. v. Bos. Sci. Corp.*, 333 F.3d 737, 743 (7th Cir.

2003); *Pierri v. Medline Indus., Inc.*, 970 F.3d 803, 808 (7th Cir. 2020); *Tart v. Illinois Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004)); ECF 55 at 4). All Defendants succeed in doing is outlining the contours of the merits-based arguments arising from Dr. Haldar's allegations that she suffered the severe sanction of demotion in rank, based largely on an interpretation of the Faculty Contract and Academic Articles that differs from Dr. Haldar's interpretation.

By developing academic freedom and lab space arguments in response to the motion dismiss, Dr. Haldar also previews some of her merits-based arguments for establishing a breach of contract by the University. She equates the restrictions, as alleged in her Complaint, with "a campaign of interference" with her academic freedom and as direct breach of the detailed promises of lab space in the 2008 Offer Letter. In response, Defendants invoke provisions in the Faculty Contract[2] and the Academic Articles[3] that define other faculty duties and argue that Dr. Haldar did not comply with those duties.

---

[2] The Faculty Contract requires faculty to perform their duties "in conformity with the policy of the University" and "to observe the rules and regulations of the University . . . and, by personal conduct, to promote the principles and ideals for which the University stands." (ECF 1-2 at 3).
[3] The Academic Articles establish obligations for faculty related to the exercise of academic freedom that include:

> respectful allowance for the exercise of these freedoms by others; proper acknowledgement of contributions made by others to one's work; preservation of the confidentiality necessary in personal, academic, and administrative deliberations; avoidance of using the University to advance personal opinion or commercial interest; and, in the course of one's utterances, work, and other conduct, protection of the basic mission of the University.

(ECF 1-3 at 6).

None of Defendants' arguments directly challenge the plausibility of Dr. Haldar's allegations of breach of contract in Count II of her Complaint. They simply contend that Dr. Haldar's breach of contract claim cannot be sustained and should therefore be dismissed now and with prejudice. Such an outcome would be premature given the competing interpretations of the contract at issue and the competing legal theories the parties invoke. Therefore, Defendants' motion to dismiss as to Count II is denied.

**B.    Count III: Breach of Duty of Good Faith and Fair Dealing against the University**

Through Count III, Dr. Haldar alleges that the University breached the implied covenant of good faith and fair dealing arising from her contractual relationship to serve as a tenured professor and as Director of the CRND. Dr. Haldar alleges that the University deprived her of the reasonable expectations of her contract, including serving as the CRND Director until her retirement and being "provide[d] the process guaranteed in her Faculty Contract before imposing discipline." (ECF 1 at 23). Dr. Haldar also alleges that the University deprived her of the ability "to perform her duties as director of the Center, . . . to perform her scientific work . . . to perform her duties as a tenured professor, including operating her laboratory, mentoring students and staff, hiring lab personnel, and applying for grants"; and to be afforded "the process guaranteed in her Faculty Contract before imposing discipline." (*Id.*).

Defendants argue that Count III should be dismissed because any claim sounding in breach of good faith and fair dealing under an employment contract is

subsumed into a breach of contract claim and cannot be pursued separately. Alternatively, they argue that a two-year statute of limitations applies precluding reliance on the 2022 Restrictions, including Dr. Haldar's removal as CRND Director, to support her claim. They then contend that there was no contractual obligation or resulting duty of good faith and fair dealing related to Dr. Haldar's role as CRND Director or to her job duties.

Indiana recognizes an implied covenant of good faith and fair dealing arising out of employment contracts. *Perron v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 856 (7th Cir. 2017); *Allison v. Union Hosp., Inc.*, 883 N.E.2d 113, 123 (Ind. Ct. App. 2008); *see also Gregorich v. Tyson Foods, Inc.*, No. 3:19-CV-545 RLM-MGG, 2020 WL 3790590, at *2 (N.D. Ind. July 7, 2020). "A party violates the implied duty of good faith and fair dealing when, though not breaching the *express* terms of the contract, he nonetheless behaves unreasonably or unfairly." *Perron*, 845 F.3d at 856 (emphasis in original). Yet Indiana does not recognize a "an independent tort action for breach of an implied contractual covenant of good faith." *Ray Skillman Oldsmobile & GMC Truck, Inc. v. Gen. Motors Corp.*, No. 1:05-CV-0204-DFH-WTL, 2006 WL 694561, at *6 (S.D. Ind. Mar. 14, 2006) (citing *Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 123–24 (Ind. Ct. App. 1992) (finding no separate cause of action existed for tortious breach of contract)). Claims for breach of good faith and fair dealing have been allowed in the context of insurance contracts, but not employment contracts. *Bowers v. Anthem, Inc.*, Case No. 1:19-cv-00802-TWP0DLP, 2019 WL 5965235, at *6 (S.D. Ind. Nov. 13, 2019); *cf. Amaya v. Brater*, 981

N.E.2d 1235, 1239 (Ind. Ct. App. 2013) (finding a claim for breach of an implied

covenant of good faith and fair dealing claim in a student-university relationship

duplicative of the contemporaneous breach of contract claim).

Here, Dr. Haldar alleges breach of good faith and fair dealing arising from what

she calls "the CRND Contract" and her "Faculty Contract." Her specific allegations

focus on her removal as CRND Director and the restrictions on her work as both the

CRND Director and a tenured professor, both of which also form the basis of her breach

of contract claim in Count II. As a result, her allegations that the University deprived

her of reasonable expectations arising from her contractual relationship are inherently

part of, or subsumed into, her breach of contract claim. *Cf. Amaya*, 981 N.E.2d at 1239.

Accordingly, Dr. Haldar's separate claim for breach of good faith and fair dealing in

Count III is dismissed. The parties' remaining issues regarding Count III, such as the

appropriate statute of limitations and the scope of enforceable contractual rights and

duties surrounding the University's management of Dr. Haldar need not be addressed

now but could be issues relevant later in litigating Dr. Haldar's breach of contract claim

in Count II.

### C.    Count I: Section 1981 Claims

In Count I, Dr. Haldar alleges that all Defendants violated 42 U.S.C. § 1981 by

"subjecting her to unequal treatment based upon her race [when they] terminated her

directorship of the CRND and imposed severe, unnecessary restrictions on her

laboratory, teaching, mentoring, and hiring" and by retaliating against her "by stopping

funding for her research, prohibiting her from talking to donors, removing her from her endowed chair, and announcing the closure of her lab." (ECF 1 at 21). Defendants seek dismissal of the discrimination claim against Ms. Parseghian only and the retaliation claims against all Defendants.

As to the Parseghian claims, Defendants argue both claims fail because they rely on allegations outside the statute of limitations. Dr. Haldar alleges, among other things related to Ms. Parseghian that she (a) wanted a white male professor hired as the first CRND Director in 2008 instead of Dr. Haldar; (b) refused Dr. Haldar entry to a conference in 2019 and falsely accused her of stealing the white male professor's scientific results; (c) told Dr. Haldar in 2019 that "she did not like her because Dr. Haldar did not represent 'her' (Parseghian's) Notre Dame"; and (d) influenced the Dean in 2019 to urge Dr. Haldar to resign as CRND Director because Ms. Parseghian "did not like" Dr. Haldar. (ECF 1 at 7–9). No one disputes that the four-year statute of limitations codified at 28 U.S.C. § 1658 applies to Dr. Haldar's Section 1981 claims. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383 (2004). As a result, alleged conduct before October 11, 2020—four years before Dr. Haldar filed her Complaint on October 11, 2024—is time-barred as to the Section 1981 claims absent any exception. *See, e.g.*, *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 269 (7th Cir. 2004).

## 1. Discrimination Claim against Ms. Parseghian

To prevail on a Section 1981 discrimination claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally

protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). A Section 1981 complaint must allege facts that "permit the inference of but-for causation." *Mir v. State Farm Mut. Auto. Ins.*, 847 Fed. App'x 347, 350 (7th Cir. 2021).

Here, Dr. Haldar alleged potentially race-based conduct by Ms. Parseghian in 2008 when she expressed preference for a white male for the CRND directorship and in 2019 when she told Dr. Haldar that she did represent "her (Parseghian's) Notre Dame." (ECF 1 at 7–8). But these acts occurred before October 11, 2020, and are time-barred as noted above. In support of the Parseghian discrimination claim, Dr. Haldar focuses on Ms. Parseghian's other conduct, including refusing her admission to a conference, accusing her of stealing scientific results, and influencing the former Dean to have her removed as CRND Director, which also occurred before October 11, 2020. Based on this trail of time-barred conduct, Dr. Haldar argues that the Complaint plausibly alleges Ms. Parseghian influenced Dean Schnell in 2021 to remove Dr. Haldar as CRND Director. Dr. Haldar contends that she has stated a plausible Section 1981 discrimination claim because there is a "relatively low bar for pleading discrimination" against Parseghian. (ECF 54 at 19 (citing *Freeman v. Eaton Corp.*, No. 23-2981, 2024 WL 4200580, at *3 (7th Cir. Sept. 16, 2024)). According to Dr. Haldar, her Complaint only must "assert that she was treated worse because of protected characteristics" to survive Defendants' motion to dismiss. (*Id.* at 20 (citing *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021)).

*Freeman* and *Graham* do not involve Section 1981 claims, however. In *Freeman*, the court was assessing the plausibility of a Title VII discrimination claim. To plead a

plausible Title VII discrimination claim, a plaintiff need only allege race as a "motivating factor." *Freeman*, 2024 WL 4200580, at *3. The *Graham* court addressed a claim by a teacher that the school system who employed her violated 42 U.S.C. § 1983 by discriminating against her on account of sex and race. 8 F.4th at 626. Relying on *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the court affirmed a low bar for pleading Section 1983 discrimination. *Graham*, 8 F.4th at 627. That said, neither case accounts for the requirement that but-for causation be pled in Section 1981 claims as established in *Comcast* and applied in *Mir*. *See Comcast*, 589 U.S. at 341; *Mir*, 847 Fed. App'x at 350.

Without the time-barred race-based allegations, Dr. Haldar's Complaint does not allege discrimination because of race by Ms. Parseghian beyond the speculative level. *See Concentra Health Servs., Inc.*, 496 F.3d at 776. As a result, Dr. Haldar has not stated a plausible Section 1981 discrimination claim against Ms. Parseghian. *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### 2.      Retaliation against All Defendants

"To state a retaliation claim under § 1981[4] based on events occurring in the workplace, an employee must show that she suffered a materially adverse action because she engaged in protected activity." *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016); *see also Clark Cnty. Schl. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (requiring

---

[4] The same standard applied to Title VII retaliation claims applies to Section 1981 retaliation claims. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007).

plaintiffs to demonstrate a causal connection between protected activity and the adverse action to prevail on a Title VII retaliation claim). "If the causation is based on 'mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action,' the temporal proximity must be 'very close.'" *Peppers v. Benedictine Univ.*, No. 1:17-CV-03387, 2017 WL 6816734, at *6 (N.D. Ill. Dec. 12, 2017) (quoting *Breeden*, 532 U.S. at 273). "But no bright-line timing rule can be used to decide whether a retaliation claim is plausible or whether it should go to a jury." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014). "The facts and circumstances of each case necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment action is linked to an employee's earlier complaint." *Id.* (quoting *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).

Defendants challenge Dr. Haldar's retaliation claims based on the temporal proximity between Dr. Haldar's protected activity of filing her faculty grievance and EEOC charge in 2022 and the University's revocation of funding for maintenance of the mouse colony in November 2023 and imposition of the 2024 restrictions in September 2024. Temporal proximity alone may not state a plausible claim of retaliation, but a large temporal gap is not dispositive when considering the allegations as a whole. *See Carlson*, 758 F.3d at 829; *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022), *overruled on other grounds by Paterakos v. City of Chicago*, 147 F.4th 787 (7th Cir.

2025). Here, Dr. Haldar has alleged facts that could link the University's actions in 2023 and 2024 to her protected activity in 2022.

As to timing, Dr. Haldar alleges that the November 2023 revocation of funds was timed to "do the most damage" given the state of the mouse colonies at that time. (*See* ECF 1 at 16). Dr. Haldar also argues that there was no intervening event between the conclusion of her faculty grievance in March 2023 and the revocation of funds about eight months later.

Dr. Haldar also contends that the restrictions were imposed without justifiable reasons. Dr. Haldar alleges that Dean Schnell revoked funding in 2023 because she had used funds without permission when she had secured permission for the funds she used. (ECF 1 at 15). She alleges that she was barred from speaking to donors and from attending a conference because she had harassed donors even though those donors continued to seek her out. (*Id*. at 17). The Complaint also alleges that the 2024 Restrictions were justified by false allegations of a dispute with Dr. Haldar's former colleague and interference with a government account held by the University. (*Id*.). Taken as true and taken as a whole, these facts alleged in the Complaint suggest pretextual reasons for the actions taken against her, which in turn creates an inference of a causal nexus between her protected activity and the 2022 and 2024 Restrictions. Dr. Haldar may or may not ultimately prove retaliation against the University and Dean Schnell, but her Complaint alleges a plausible claim of retaliation against them.

Dr. Haldar does not, however, allege facts from which an inference can be made linking Ms. Parseghian to any retaliation. The Complaint alleges no direct facts connecting Ms. Parseghian to Dr. Haldar's protected activity or the Restrictions imposed on her. Dr. Haldar simply hypothesizes that Ms. Parseghian could have learned about her protected activity because of her status as a trustee of the University and her friendship with the University Provost. These are conclusory allegations that are not "entitled to be assumed true" and do not support a plausible claim of race-based retaliation against Ms. Parseghian. *See Iqbal,* 556 U.S. at 681; *Comcast,* 589 U.S. at 341.

### D.      Count VII:  ADEA Discrimination Claim against the University

In Count VII, Dr. Haldar alleges that she was over 40 years old, and that she performed her job as CRND Director from 2008 until 2022 when she was replaced by two younger professors lacking experience or expertise to perform the job. (ECF 1 at 27). She also alleges that Dean Schnell notified her of his "desire to remove her as CRND Director" and told her "he wanted to replace her with someone younger; a 'mid-career' scientist." (*Id.*). Dr. Haldar specifically alleged that "age was a motivating factor" in the decision to remove her as CRND Director." (*Id.*). According to the Complaint, Dr. Haldar "reluctantly agreed to step down when a new CRND director was ready to take over," in response to her conversation with Dean Schnell about the future of the CRND directorship after which, Dean Schnell began excluding her from meetings about the CRND. (*Id.* at 9).

The ADEA "protects workers 40 years of age and older from age-based employment discrimination. *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018). As relevant here, the ADEA provides that "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "To establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). "Unlike Title VII, the ADEA . . . does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *Id.* at 174.

At the pleadings stage, however, dismissal is not warranted for an "imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). In alleging a discrimination claim, "a plaintiff need plead only the type of discrimination, when it occurred, and by whom." *Stumm v. Wilkie*, 796 F. App'x 292, 295 (7th Cir. 2019).

Dr. Haldar alleges that age was a motivating factor in her removal as CRND Director, which does not reflect the standard for causation she would eventually need to prove to prevail on her ADEA discrimination claim. *See Gross*, 557 U.S. at 174. At the same time, Dr. Haldar alleges facts linking her removal as the CRND Director to her age. She alleges that Dean Schnell discussed replacing her with a "mid-career" associate professor who would presumably be younger than her given her higher rank of tenured

professor. Dr. Haldar alleges that she "reluctantly agreed to step down" from the position after talking to Dean Schnell and he started excluding her from CRND meetings after that. Lastly, she alleges that she was replaced by two younger professors. In other words, Dr. Haldar alleges age discrimination in 2022 when Dean Schnell removed her as CRND Director. *See Stumm*, 796 F. App'x at 295. This is enough to put the University on notice of the age discrimination claim against it and to allege a causal link between her age and her removal as CRND Director. *Id.* (finding complaint adequately alleged an ADEA discrimination claim even though the plaintiff did not allege the elements of his age, the age of the individuals hired instead of him, or how much younger they were).Therefore, Count VII plausibly states a claim for age-based discrimination by the University under the ADEA.

> **E.**    **Tortious Interference with Contract Claims against Ms. Parseghian and Dean Schnell**

"A plaintiff alleging tortious interference with a contractual relationship must establish five elements: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of the breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach." *Allison*, 883 N.E.2d at 118 (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235 (Ind. 1994)). "A party cannot 'interfere' with its own contracts, so the tort itself can be committed only by a third party." *Trail v. Boys & Girls Clubs*, 845 N.E.2d 130, 138 (Ind. 2006). Officers and directors of corporations acting in their official capacity as agents of

the entity are acting as the entity itself, not third parties, and cannot be "personally liable for tortious interference with the corporation's contracts unless they acted outside the scope of their official duties in causing the breach." *Id.*

Dr. Haldar alleges that both Ms. Parseghian and Dean Schnell interfered with her contracts resulting in her removal as CRND Director in May 2022 and the closure of her lab, announced in September 2024 to be effectuated in December 2024. On the face of her Complaint, Dr. Haldar alleges facts consistent with each of the five elements of tortious interference. Defendants argue, however, that she cannot succeed on her tortious interference claims because the statute of limitations precludes her claims; because she has not alleged a plausible breach of contract claim; and because Ms. Parseghian and Dean Schnell cannot be liable for tortious interference because they are agents of the University, not third parties.

To start, the Court already found that Dr. Haldar alleged a plausible breach of contract claim. As such, her breach of contract allegations sufficiently allege the underlying breach of contract necessary to support her tortious interference claims.

Second, "[t]he Indiana statute of limitations for a tortious interference with contract claim is two years from the time the cause of action accrued, or when the plaintiff first knew of her injury resulting from a breach of the contract." *Dochee v. Methodist Hosps., Inc.*, No. 2:21-CV-275-JEM, 2024 WL 4345774, at *3 (N.D. Ind. Sept. 30, 2024) (citing Ind. Code § 34-11-2-4(a)). Dr. Haldar does not dispute that the two-year statute of limitations applies. She states in a footnote that she is not seeking recovery for

injuries she sustained as the result of Ms. Parseghian's and Dean Schnell's tortious conduct outside the statute of limitations—or "more than two years before filing the complaint." (ECF 54 at 23 n.6). Yet the Complaint alleges tortious interference based on Dean Schnell's decisions to impose the 2022 and 2024 Restrictions, including removing her as CRND Director in 2022 and ordering the closure of her lab in 2024. (ECF 1 at 25–26). Similarly, the Complaint alleges that Ms. Parseghian tortiously interfered with Dr. Haldar's contracts by persuading Dean Schnell to remove her as CRND Director and being the impetus for his actions against her, including closing her lab. (*Id*. at 24–25). Thus, Dr. Haldar alleged acts that occurred before October 11, 2022, and would fall outside the statute of limitations. But she also alleged acts and injuries after October 11, 2022, which would fall within the statute of limitations period. Therefore, Defendants' statute of limitations argument does not, on its own, justify dismissal of Dr. Haldar's tortious interference claims.

Defendants' strongest argument for dismissal of the tortious interference claims relate to Ms. Parseghian's and Dean's Schnell's status as agents of the University. As to Ms. Parseghian, she is undisputedly an officer or director of the University and not a third party. *See Trail*, 845 N.E.2d at 138. Thus, to state a plausible claim of tortious interference against Ms. Parseghian, Dr. Haldar would need to allege conduct outside the scope of her official capacity. While the Complaint alleges nothing to define the scope of a University trustee's official capacity, the parties both seem to assert in their briefs that involvement in University employment decisions would be outside Ms.

31

Parseghian's role as a University trustee. Defendants contend that the Complaint is silent as to any involvement by Ms. Parseghian in decisions related to Dr. Haldar's employment. Yet, the Complaint alleges that Ms. Parseghian persuaded Dean Schnell to remove Dr. Haldar as CRND Director, and that she was the impetus for Dean Schnell's actions against Dr. Haldar, including the closure of her lab. (ECF 1 at 8–9, 25). With these allegations, Dr. Haldar has alleged conduct by Ms. Parseghian related to the employment decisions against her and outside the scope of her official University capacity. Thus, Dr. Haldar has alleged a plausible claim of tortious interference against Ms. Parseghian.

As to Dean Schnell, Defendants argue that the tortious interference claim against him must be dismissed because he is an academic officer of the University responsible for faculty employment decisions, including those he made affecting Dr. Haldar's work. Dr. Haldar, on the other hand, argues Dean Schnell is a third party subject to liability for tortious interference because he is not a corporate officer of the University. *See Trail, 845 N.E.2d at 138*. Indiana law provides that "[a] corporation has the officers described in its bylaws or elected or appointed by the board of directors in accordance with the bylaws . . . ." Ind. Code § 23-1-36-1. The University Bylaws, incorporated into the Academic Articles, state that "[a]ll officers of the University shall be elected by the Board of Trustees and shall consist of a President, a Provost, an Executive Vice President, and such other officers as the Board of Trustees (after consultation with the President) may from time to time determine." (ECF 53-5 at 4; ECF 40-2 at 6). Yet in

32

Indiana, supervisors and other agents of an employer cannot be liable for tortious interference with an employee's employment, regardless of their personal motives, when their actions fall within the scope of their duties for the employer. *Leslie v. St. Vincent New Hope, Inc.*, 873 F. Supp. 1250, 1256–57 (S.D. Ind. 1995); *cf. Martin v. Platt*, 386 N.E.2d 1026, 1027 (Ind. Ct. App. 1979). Therefore, Dean Schnell—an agent of the University charged with responsibility for faculty employment decisions—is not a third party subject to liability for tortious interference even if he is not a corporate officer of the University, elected consistent with the Bylaws.

Dr. Haldar does not appear to argue in response to Defendants' motion to dismiss that Dean Schnell acted outside his authority as an academic officer of the University either. The Complaint alleges that he conspired with Ms. Parseghian to interfere with her contracts; that he removed her as CRND Director without legitimate justification; and made false allegations against her and closed her lab. (ECF 1 at 26). But the Complaint lacks any allegations that Dean Schnell acted outside his authority when imposing any of the sanctions at issue, including removing Dr. Haldar as CRND Director and closing her lab. Without such allegations, the Complaint fails to state a plausible claim of tortious interference against Dean Schnell.

33

**III.    CONCLUSION**

For the reasons discussed above, Defendants' motion to dismiss is **GRANTED IN PART.** (ECF 39). The following claims in Dr. Haldar's Complaint are dismissed:

- Count I (in part): Section 1981 Retaliation only against Ms. Parseghian;

- Count III: Breach of Good Faith and Fair Dealing against the University; and

- Count V: Tortious Interference with Contract against Dean Schnell.

SO ORDERED on September 29, 2025.

  /s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT